STATE OF WEST VIRGINIA

v.

PAUL WITHROW

(No. 10856)

Submitted January 15, 1957. Decided March 5, 1957.

*Dewey B. Jones,* for plaintiff in error.

*John G. Fox,* Attorney General, *Charles R. McElwee,* Assistant Attorney General, for defendant in error.

RILEY, PRESIDENT:

In this criminal prosecution of State of West Virginia against Paul Withrow, the defendant, Paul Withrow, was indicted on October 3, 1955, by the Grand Jury of the Intermediate Court of Kanawha County, upon a charge that he: "* * * on the ___ day of September, 1955, and prior to the date of the finding of this indictment, in said County of Kanawha, unlawfully and feloniously did commit the detestable and abominable crime against nature by then and there, to-wit: on the day and year aforesaid, in the County aforesaid, feloniously and unlawfully having carnal knowledge of Laura Moore, a female person, by and with the mouth, against the peace and dignity of the State." A trial by jury was had during the September, 1955, term of the intermediate court,

and the defendant was found guilty as charged in the indictment. The trial court sustained defendant's motion to set aside the verdict of the jury on the ground that the State had failed to prove its case against the defendant, and granted the defendant a new trial.

At the January, 1956, term of the Intermediate Court of Kanawha County, the defendant was arraigned, and entered a plea of not guilty. Thereupon a jury was impaneled, and the court proceeded with the trial of the case. At the conclusion of the State's evidence, the defendant moved the trial court to strike the evidence of the State and direct the jury to find a verdict of "Not Guilty", which motion was overruled by the court. Thereupon the defendant introduced evidence in his defense and rested. On January 31, 1956, the jury found the defendant guilty as charged in the indictment, and the defendant moved the court to set aside the verdict of the jury as being contrary to the law and evidence, and to award him a new trial. On February 8, 1956, this motion was overruled by the court, to which ruling of the court the defendant objected and excepted and judgment of sentence was entered, ordering that defendant be confined in the State Penitentiary for an indeterminate term of not less than one year nor more than ten years. On June 7, 1956, the defendant presented his petition to the Circuit Court of Kanawha County, praying for a writ of error and supersedeas to the judgment of the intermediate court, and on July 5, 1956, the circuit court refused the writ of error and supersedeas prayed for in defendant's petition for the reason that the judgment, as shown by the record, is plainly right. To this judgment of sentence this writ of error to this Court was granted.

The alleged crime, according to the evidence, occurred between the hours of ten and ten-thirty o'clock on the morning of September 30, 1955, in the girls' restroom of Tiskelwah School during Laura Moore's (hereinafter sometimes referred to as the "prosecutrix") third trip to the restroom, with the permission of her teacher, Mrs.

Mabel Carnes, and while she was attempting to vomit.

At that time a man entered the restroom from the door leading immediately into the school yard, and thence to the street. This man was described by prosecutrix as wearing a maroon corduroy shirt and gray trousers. The prosecutrix also testified that the man she described had represented himself to be a doctor, and informed her that he had come to help her; that he also requested that she pull down her panties; that he would make her feel better; and that after she had pulled down her panties and sat down on the commode this man placed his mouth on her privates. More specifically this record discloses that prosecutrix testified as follows:

"Q. After you pulled down your panties and sat on the commode what did he do?

"A. He put his mouth on my privates.

"Q. And when he put his mouth on your privates, did you feel anything?

"A. Yes, sir.

"Q. What did you feel?

"A. It felt like his tongue.

"Q. It felt like his tongue doing what?

"A. Well - do you want me to show you?

"Q. Well, did it feel like his tongue was going up into your privates?

"A. Yes."

This witness then testified that her dress and slip fell down in the commode, and that the man then stopped molesting her and pulled out his privates. She further testified that she saw the man's "private," and thereupon she turned her head and screamed; whereupon the man immediately retreated through the outside door, and witness fled screaming up the stairs to her teacher, who was in her classroom, in the presence of the boys and girls in her grade.

When prosecutrix returned from her third trip to the restroom, she was crying, and put her arms around Mrs. Carnes and told her that something "awful" had happened; that she could not tell it before the boys and girls; and that thereupon Mrs. Carnes took prosecutrix out into the hall, and the little girl then told her what had happened. Mrs. Carnes testified that: "* * * I took her out in the hall, she said a man had come in the basement, had made her sit back on the commode, and had put his mouth against her privates; and in so doing her dress and slip had went into the water, and they were wet. And she said he took out his private, and that is when she got away, and came running to me. She described him as being a tall, rather thin, dark man, tall, needed a shave, had a maroon shirt and khaki pants; he also needed a shave. And he also represented himself as being a doctor to her." Mrs. Carnes then, because of the temporary absence from the school building of the principal, Mr. Garrett, requested the school janitor, John Hicks, to call the police.

At the time of the alleged crime Hicks, the janitor, was standing about a hundred and fifty feet from the door leading into the girls' restroom. He testified that about ten o'clock on the morning of September 30, 1955, he saw a man, whose face he could not see, come out of the upper door, which was the entrance to the girls' restroom. This man, the witness testified, did not come out on the walk, but came right out of the door upon the dirt of the school yard to the gate, and then went up Homer Street. Hicks further testified that "I seen all of him in the back, I didn't see his face at all"; that the man was not wearing a hat; that he had black hair; and that he wore "wash trousers, kind of a light-like color".

Hicks further testified that the door through which he saw the man leave was the entrance to the girls' restroom; that the girls' restroom is on the upper end of the school; and that the boys' restroom is on the lower end. He also testified that there are six commodes in the girls' restroom with no individual stalls and not set in

booths; that if a person would step inside the door all of the commodes would be in plain view; that the "walls and the door is what prevents an open exposure to the girls' restroom"; that "there is a wall here [indicating], here, here, and over there; and there is the door [indicating]"; and that the commodes are lined up against the opposite wall from the door. He also testified that "The seats is just ordinary, like you have in your home, you raise the lid up, lay it down"; that there is no "water box" immediately behind the seats, but a 1½ or 2-inch pipe running along the wall immediately behind the commodes.

A contractor, R. C. Hargraves, who at the instance of defendant's brother, Harry B. Withrow, made a measurement of the height of the commodes in the girls' restroom at the school testified as to those measurements at the first trial; but, having set them down on a paper, which he gave to Harry B. Withrow, he did not remember the figures on the second trial.

The defendant's brother, Harry B. Withrow, testified that the height of the commodes, as ascertained by defendant's witness Hargraves, from the floor to the top of the commode seats is, as well as this witness remembered, sixteen and a half inches.

During the course of the trial the prosecutrix was examined as shown by the following questions and answers:

"Q. Laura, if you will step down here and show just how you were sitting on the commode -.

"A. Do I have to?

"Q. This won't take but a minute. These gentlemen are all interested in you.

(The witness then demonstrated by sitting in a chair in front of the jury.)

"Q. And your panties, where were they at that time, Laura?

"A. Down, down around my ankles.

"Q. Did you have them pulled apart?

"A. Yes.

\* \* \*

"Q. And did you have on a dress?

"A. Yes.

"Q. While you were sitting like that did anything happen to your dress?

"A. Yes, sir.

"Q. What happened to it?

"A. It fell in the commode, got wet; the slip, too.

"Q. After he did that what else did he do?

"A. Well, he stopped then, and he pulled out his privates.

"Q. Did you see his private?

"A. Yes - I turned my head.

"Q. And what did you do then?

"A. I screamed.

"Q. After you screamed what did he do?

"A. He ran out.

"Q. And then what did you do?

"A. I stopped for a minute, I was scared, then I pulled up my pants, ran upstairs as fast as I could."

The prosecutrix described the defendant to the police as being a white male, approximately thirty years old, six feet tall, one hundred fifty pounds, dark hair in need of a hair cut, and dressed in khaki trousers and a maroon sports shirt, and wearing no hat.

The testimony of the janitor was confirmed to some

extent by State's witnesses, Mrs. Estelle Campbell, and her daughter, Mrs. Catherine Anderson, who resided in a house about twenty feet off the street and about a half block from Tiskelwah School. They testified that a little after ten o'clock, between ten and ten-thirty, on the morning of September 30, 1955, a man in a two-toned green automobile drove up and stopped in front of their house. According to these two witnesses, the man was wearing khaki trousers and a maroon shirt. He was identified by Mrs. Campbell as Paul Withrow, she basing such knowledge on the fact that defendant had formerly picked up her dry cleaning, when she lived in Kanawha City. Mrs. Campbell further testified that the man, whom she recognized as the defendant, upon leaving the automobile "hesitated on the other side of the car, went across the street on out the street, and, directly into the school grounds." This witness further testified in answer to the question whether Withrow went into the school house, replied, "Yes, directly into the door, as if he knew where he was going." And, in answer to an inquiry whether the door was near the girls' restroom, Mrs. Campbell answered, "The door through which Withrow entered was the door near and leading into the girls' restroom." In about ten minutes, according to these witnesses, defendant came out, not running but walking hurriedly. He then entered his car, backed it very fast into A Street, and headed it toward Seventh Avenue. The next time Mrs. Campbell saw Withrow was when the police of the City of Charleston brought him to the gates of the school grounds a short time later.

Pat Toney, a member of the Police Department of the City of Charleston, while in a cruising car, received a call at Court and Kanawha Streets in the immediate vicinity of the Courthouse of Kanawha County. He testified he arrived at Tiskelwah School in approximately five or six minutes, that is about 10:15 on the morning of September 30, 1955; and that he had a general description of the man who entered the girls' restroom, which description he gave to headquarters.

Russell Adkins, a motorcycle patrolman, when he called from a call box, was told to go by the school to see if he could help. Adkins immediately proceeded to the school, where Officer Toney gave him a description of the suspected man. Adkins then went to a poolroom on Patrick Street, assigning as the reason therefor that he had in mind the identity of the man, but did not know his name. At the poolroom he learned that the man he suspected was Paul Withrow; and thereupon he went to the Withrow home at No. 1633 Fourth Avenue, about five blocks or a five-minute walk from the school, the time being between ten to ten-fifteen in the morning. When he entered the house he saw Withrow with another man, Fred O'Connor, sitting at a table with a bottle of wine between them. This witness talked with Withrow a couple of minutes, and then left and went back to the school. Officers Toney and Arlie Robinson were there by that time. The three officers then entered Toney's cruiser, and went to the Withrow home, and all three went in. Toney and Adkins asked Withrow to drive with them to Tiskelwah School, to which the defendant agreed. When Withrow got out the car at the direction of the officers, Withrow and Adkins went to the steps going into the school on the street above Florida Street, "I believe it is First Avenue", Adkins testified. When the officers arrived at the school, Hicks was standing on the steps and the principal, Mr. Garrett, then brought the little girl out within eight or ten feet of the defendant. Adkins noticed that Withrow kept shaking his head "like this (illustrating)", and "he backed around in behind of me."

The prosecutrix, when Withrow was first shown to her, said he was shaking his head "No", and stated she did not identify the defendant as the man who had allegedly molested her. She did, however, identify Withrow, when she was in Mr. Garrett's automobile, and Withrow was in the cruiser car nearby. It seems that Withrow was in the back seat on the left side of the cruiser, and when it was parked at A Street another car pulled up with Mr. Garrett in the driver's seat, and the prosecutrix on the right side.

Officer Toney testified that defendant was "unsteady on his feet"; but Officer Adkins testified, "No, I don't think a man would shake his head if he is unsteady on his feet - he was switching his head back and forth. I have seen the man for two years down on the west side, I have never seen him do that before"; but Adkins testified that "I wouldn't say the man was drunk, the man had been drinking."

While at the school one of the officers placed defendant under arrest. Defendant was then required to enter the police car, and was taken to headquarters, where prosecutrix' mother, Mrs. Robert Moore, was awaiting the arrival of her little girl. Up to this time, defendant testified, he had not been advised what the officers wanted him for, but became aware of the charge when Mrs. Moore signed the complaint at police headquarters.

Defendant's witness, Fred O'Connor, who was in the Withrow house at the time Officer Adkins arrived there, said he first saw Withrow about nine o'clock on the morning of the 30th of September, 1955, or later, at the Withrow home; that he and Withrow talked about moving some furniture; that witness went to the liquor store to get a bottle of wine, for which defendant gave him the money; that when he returned to defendant's house, defendant was using the telephone, and he remained at the house and was present when Adkins came there the first time; and that after a while other officers, together with Officer Adkins, came to the Withrow house, and took defendant away. O'Connor estimated that it was about ten minutes up and ten minutes walk back from the Withrow house to the liquor store; that he was unemployed at the time he testified, but that he was a painter; and that on returning from the liquor store he had a conversation of ten or fifteen minutes with a man who had been with Withrow the evening before. From this witness's testimony it appears that defendant's witness, Lillian Whited, owned a two-toned automobile; that she was a friend of the defendant; and that witness did not see Mrs. Whited's automobile that morning, nor did any

other witnesses, except Mrs. Campbell and Mrs. Anderson.

Joseph Whittington, an employee of the State Liquor Commission, who was on duty on the morning of September 30, 1955, testified he was acquainted with Fred O'Connor; and that O'Connor did not have to wait at the store that morning in order to be served.

For the purpose of establishing an alibi, defendant introduced two evidently disinterested witnesses, Clara Sue Bowen and Ewell Hatfield. Clara Bowen, who was employed in the office of Carl R. Robinson, who operates a collection agency, testified that she had a business call from the defendant on the morning of September 30, 1955, at approximately ten-fifteen; that she talked with him about fifteen or twenty minutes; and that she recalled the time of the telephone conversation because a girl in the office left about five minutes to ten for an appointment with a physician. Ewell Hatfield, who was engaged in the general insurance business in the City of Charleston, on September 30, 1955, with offices in the Peoples Building, testified on behalf of the defendant that he had done some business with the defendant; that if September 30, 1955, was the date of the conversation which he had with Paul Withrow according to his testimony at the first trial, that was the right date; and that the conversation occurred around ten-thirty o'clock in the morning.

Defendant's witness, Mrs. Lillian Whited, testified on cross examination that she was married and lived with her husband; and, over objection, testified that she had not been "dating" Paul Withrow; that she had talked with Detective Sergeant D. C. Stover of the Charleston Police Department; that "I wouldn't say 'dates'; he did most of the talking, I didn't say much"; that "I might run around with him, I wouldn't say 'dates'; that's different"; and further this witness testified that she had taken defendant to see his little girl, who lived in the country, "a lot of times". After testifying, over defend-

ant's objection, in answer to the question: "* * * you went into the Police Department to talk to Sergeant D. C. Stover, did you not, * * *? And after you talked to him you admitted to him you dated Paul Withrow, didn't you", said: "I wouldn't call it 'dating'"; and then, without objection to either question or answer, the witness was asked, "Then you say you didn't admit to Sergeant Stover that you dated Paul Withrow", to which she replied, "I don't know how he taken it, I don't take it as 'dating'. I would do the same for anyone that asked me to take them anyplace; I would do the same for you." The witness then testified, without objection, as follows:

"Q. Didn't you also tell Sergeant Stover that you had had relations with him?

"A. I did.

"Q. What kind of relations?

"A. Normal relations.

"Q. You didn't tell Sergeant Stover anything about abnormal relations?

"A. I did not."

The defendant, Paul Withrow, testified that he was thirty-nine years of age; that he lived at No. 1633 Fourth Avenue in the City of Charleston, on September 30, 1955; that the night before the alleged crime he had stopped at a poolroom on Patrick Street; that at that time he was in his work clothes; and that after he left the poolroom he went home, "washed, ate a bite. That shirt was too dirty to wear on the street, I changed to a white shirt, a white cotton knit shirt, and went over to the liquor store. And I had a drink or so, * * *"; that upon returning home he went to bed with his clothes on; and that the next morning he got up about nine-thirty, being awakened by Fred O'Connor who wanted a drink. He testified that O'Connor went to the liquor store about ten o'clock a.m., and that he then made two telephone calls. At the time Officer Adkins came to the Withrow

house, witness testified he had had two drinks; and that when Officer Adkins first came in he questioned him "about a car, and that was all and left". About ten minutes later Officer Adkins came back with Officer Toney and Detective Sergeant Robinson; that they questioned the witness about a car, and asked witness if he would go with them "in connection with this car. So I told them yes."

On this writ of error the defendant assigns eleven grounds of error. Grounds Nos. 1, 2, 9 and 11 raise the question whether there was sufficient evidence for the jury to find beyond a reasonable doubt that defendant was guilty of the offense of sodomy; and assignments of error Nos. 3, 4, 5, 6, 7, 8 and 10 are as follows:

"No. 3. The Court erred in admitting the evidence of the prosecuting witness, Laura Moore, over the objection of the defendant, because her competency was not established.

"No. 4. The Court erred in admitting the evidence of the State's witness, Mabel Carnes, over the objection of the defendant in regard to what was told to her by the prosecuting witness, Laura Moore.

"No. 5. The Court erred in admitting in evidence the answers in response to questions propounded to the defendant's witness, Lillian Whited, by the prosecuting attorney on cross examination, over the objection of the defendant in regard to her associations and relations which she had with the defendant, Paul Withrow.

"No. 6. The Court erred in admitting the evidence of the State's witness Delbert Stover over the objection of the defendant in regard to what Lillian Whited had told him about her having unnatural sex relations with the defendant, Paul Withrow.

"No. 7. The Court erred in giving State's instruction No. 2 because there is no evidence to support that portion of said instruction which refers to the defendant, Paul Withrow, using

force on the prosecuting witness, Laura Moore, and there is no evidence to support that portion of the instruction that the defendant, Paul Withrow, placed his mouth on the vagina of Laura Moore, and this instruction does not properly advise the jury as to what acts are required to constitute the crime of sodomy.

"No. 8. The Court erred in giving State's instruction No. 1, because there was not any competent evidence upon which to base and to support the giving of said instruction, and this instruction is contrary to the law in evidence in this case.

"No. 10. The Court erred in refusing defendant's Instruction No. 5, because of the evidence as to the manner in which the prosecuting witness, Laura Moore, described that the offense was committed and the conflicts or differences in her evidence under oath in the first trial of this case and the second trial, and because of the type of defense supported by defendant's evidence of his alibi that it was impossible for him to have committed the offense as charged and adduced by the evidence of the State."

The statutory definition of sodomy, which is a crime, as contained in Code, 61-8-13, reads: "If any person shall carnally know in any manner any brute animal, or carnally know any male or female person by the anus or by or with the mouth, or voluntarily submit to such carnal knowledge, he or she shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than one nor more than ten years."

The question whether the evidence contained in this record is sufficient to sustain the instant conviction rests upon two subquestions: (a) Was the identity of the defendant sufficiently established for jury determination, which, in turn, embraces the question whether defendant has established an alibi by the evidence, tending to show that he was at his home at No. 1633 Fourth Avenue, in the City of Charleston, when the alleged crime was committed; and (b) whether the evidence is such that

the jury could have found beyond a reasonable doubt that defendant in the act of molesting prosecutrix penetrated with his tongue her sex organs.

Although in every criminal prosecution the final burden rests upon the State to establish beyond any reasonable doubt the presence of the accused at the place and time of the alleged crime, where such presence is an essential part of the crime, the burden of proving an alibi rests upon the accused, where, in his defense, he relies upon and attempts to prove an alibi. 1 M. J., Alibi, Section 4; *State* v. *Lowry*, 42 W. Va. 205, 24 S. E. 561. In point 3 of the syllabus of the *Lowry* case, this Court held: "In criminal prosecutions, while the burden of proving an alibi is on the accused, on account of its affirmative nature, yet this does not dispense with the necessity of the state's proving the actual presence of the accused at the place where, at the time when, the crime was committed, when personal presence is essential to the commission of the crime; and if, from the evidence, the jury have a reasonable doubt of the presence of the accused at the place where, at the time when, the offence was committed, they should acquit him."

In order to support his defense of alibi, the defendant introduced witnesses who testified that between the hours of ten and ten-thirty on the morning of September 30, 1955, defendant had telephone conversations with them. Two of these witnesses were evidently disinterested; but the other alibi witness was evidently a drinking companion of defendant. Bearing directly on the question of defendant's alibi, the Charleston Police Department was given a description of the man. A short time after the city police had received that information, they returned with the defendant in this case, Paul Withrow, who having been confronted by Laura Moore, shook his head from side to side. Though the first time prosecutrix failed to identify him, she subsequently identified the defendant as the man who had molested her in the girls' restroom.

John Hicks, janitor at Tiskelwah School, testified that

he was standing by a tree about one hundred fifty feet from the outside entrance to the girls' restroom; and that about ten o'clock on the morning of September 30, 1955, a man, whose face he did not see, came out and went up Homer Street. Mrs. Estelle Campbell and Mrs. Catherine Anderson, mother and daughter, who lived at No. 1212 Homer Street, their residence being about twenty feet off the street and a half a block from Tiskelwah School, testified that between ten and ten-thirty on the morning of September 30, 1955, a man in a two-toned green car drove up and parked in front of their house. This man was identified by Mrs. Campbell as the defendant, Paul Withrow, because, she testified, he had collected her dry cleaning some years earlier, when she lived in Kanawha City. These witnesses testified that the man who was identified by Mrs. Campbell as the defendant, Paul Withrow, at the time he left his automobile and entered the school building was wearing khaki trousers and a maroon shirt; that the man lighted from the car, walked toward Tiskelwah School, and entered the door near the girls' restroom; and that in about ten minutes the witnesses saw him come out the same door, and walk hurriedly back to the automobile parked in front of their house.

Mrs. Robert Moore, the mother of Laura Moore, testified that when she saw the defendant for the first time at police headquarters in the City of Charleston, she asked him: "* * *why he did such a thing to my baby, that I just couldn't understand why a man wanted to harm my baby like that"; and that in answer to the question, "What did he say to you", the witness answered, "I can't recall his exact words, he said something to the effect, 'I wish they would go ahead and examine her, they will see she isn't hurt'; or, 'They will see I didn't hurt her' - he wished they would examine her."

Without stating in further detail the evidence bearing on the identity of the defendant as being the man who was seen entering the school building, and whether the defendant has effectively established an alibi, we

hold, in view of the rule that notwithstanding the State has the final burden of proving beyond a reasonable doubt the presence of the defendant at the place and time the alleged crime was committed, the evidence in this case bearing upon this important question is, in our opinion, one for jury determination; and the jury having found the defendant guilty, as charged in the indictment, this Court is not at liberty to disturb the jury's finding in that regard.

We are of opinion, however, that the testimony, bearing on the question whether there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant by the use of his tongue penetrated the sex organs of prosecutrix, does not establish that fact beyond a reasonable doubt. In this regard we are of opinion that the evidence was not such from which the jury could find such penetration, which, under the rule set forth in 16 M. J., Sodomy, Section 2, is a necessary element of the offense of sodomy.

In the first place this record discloses beyond peradventure that the prosecutrix, who testified at the first trial, did not testify to feeling the defendant's tongue in her sex organs, her testimony being: "No, sir, I don't think so"; and that at that trial she tried to tell all she knew. Evidently this is the reason that the verdict rendered by the jury at the first trial was set aside by the trial court.

The only evidence in this regard, which would tend to prove the offense of sodomy, that is, that there was penetration, was given by the prosecutrix answering, "Yes", to the leading question asked her by the prosecuting attorney, "Well, did it feel like his tongue was going up your privates?" Prosecutrix also testified at the instant trial as follows:

"Q. And that was all he did, just put his mouth *against* your privates? (Italics ours)

"A. Yes, his mouth and his tongue."

Moreover, the prosecutrix testified, as disclosed by the

following questions and answers on recross examination:

"Q. Laura, when was it first discussed with you anything about feeling a tongue about your privates?

"A. Well, my mother and I talked it over to make sure I didn't forget anything, didn't miss anything.

"Q. Well, now, was that immediately after this man was arrested that you and your mother talked this matter over?

"A. No, sir.

"Q. When was it?

"A. The other night.

"Q. The other night?

"A. Uh, huh.

"Q. Well, how long ago, would you say?

"A. Last night.

"Q. Just last night?

"A. Yes.

"Q. Now, you had talked to your mother a number of times about this case after this man was arrested and before he was tried the other time, hadn't you?

"A. Well, we talked some, I don't know how much.

"Q. And she asked you to tell all about what happened, didn't she?

"A. Yes.

"Q. And did you tell her then about feeling any tongue about your privates?

"A. Yes, sir.

"Q. And that was before the other trial, that you told her that?

"A. No.

"Q. And you didn't tell her anything about that until after the other trial was over, then?

"A. No, I just forgot about it, then she asked me last night, she went over it again with me, and I remembered it.

"Q. And so you hadn't told the police officers anything about that, either, had you?

"A. No, sir.

"Q. Now, who was the first one that suggested anything about the tongue, you or your mother?

"A. Sir?

"Q. Who was the first one that mentioned feeling anything in your privates, you or your mother?

"A. Well, mother asked me."

This being a criminal prosecution for the statutory crime of sodomy, in which penetration is an essential element, the burden is on the State to adduce such proof on the question whether the prosecutrix' sex organs were penetrated by the tongue of defendant as to exclude every reasonable hypothesis of innocence; and the physical facts portrayed in this regard, in our opinion, raise a reasonable hypothesis of defendant's innocence. See *State* v. *Scurlock*, 99 W. Va. 629, 130 S.E. 263.

This record discloses that the defendant, Paul Withrow, is a tall man; and that the seats in the girls' restroom at Tiskelwah School were such, according to State's witness Hicks, as are found in every home. The prosecutrix testified that at the time she was molested by some man, she was seated on the commode seat, and, this record discloses that from the top of the commode seat, upon which she was sitting, to the floor was sixteen and one-half inches.

The evidence bearing on the question of penetration, in our opinion, is insufficient to sustain the verdict of the jury.

By no opinion has this Court decided that in a case under Code, 61-8-13, defining crimes against nature, penetration is a necessary element of the crime of sodomy, as defined by the statute, where the defendant is the active party and the victim is a minor female. In the case of State v. Hannigan, No. 10422, this Court on a writ of error, because of a divided Court, one of the Judges being disqualified, without opinion, entered an order on November 25, 1952, in a criminal prosecution, affirming the judgments of the Intermediate and Circuit Courts of Kanawha County in a case involving a prosecution for sodomy by a male person, who required a female person by force to commit the crime by her mouth. This order expressed the opinion *inter alia* that the Intermediate Court of Kanawha County committed no error, for the reason " that penetration must be proved beyond a reasonable doubt in a prosecution for Sodomy." In that order Judges Given and Riley were of opinion that the evidence was insufficient to establish that there was penetration, and, therefore would reverse the judgments of the Circuit and Intermediate Courts of Kanawha County; and Judges Haymond and Lovins were of opinion that such penetration was sufficiently established and stated they would affirm the judgments of those courts. There, however, is no decision of this Court, in which this Court has held that the rule that penetration, which is necessary in criminal prosecutions for rape, (15 M. J., Rape, Section 7; *State* v. *Brady*, 104 W. Va. 523, 140 S. E. 546; *King* v. *Commonwealth*, 165 Va. 843, 18 S. E. 187) must be applied to cases of sodomy or crimes against nature under Code, 61-8-13, where the perpetrator of the crime is a male person who has allegedly criminally invaded the person of a female child. In this regard the only cases in this jurisdiction involving criminal prosecutions under Code, 61-8-13, which defines crimes against nature, in which written opinions have been filed are: *State* v. *Friedman*, 124 W. Va. 4, 18 S. E. 2d 653; *State* v. *Meadows*, 124 W. Va. 412, 20 S. E. 2d 687; and *State* v. *Gargiliana*, 138 W. Va. 376, 76 S. E. 2d 265. None of these cases bears on the

question whether penetration is an essential element under the statute of carnal knowledge of "any male or female person * * * by or with the mouth", where the victim is a minor female. In all of the last-mentioned cases the alleged criminal acts, which constituted statutory sodomy *per os,* were between male persons, and *ex necessitate* the question of penetration or the necessity therefor did not arise in those cases.

At common law there was no offense of sodomy by copulation *per os.* See generally 39 Words and Phrases, Perm. Ed., pages 560 to 562, inclusive, and the 1956 Cumulative Annual Pocket thereto, page 11. But, as Code, 61-8-13, has broadened the common law definition of crimes against nature so as to include copulation *per os,* and this Court by its order in *State of West Virginia* v. *Charles F. Hannigan,* Case No. 10422, has committed itself to the doctrine "that penetration must be proved beyond a reasonable doubt in a prosecution for sodomy", we have in the instant case the question whether the evidence is sufficient for a jury to find beyond a reasonable doubt that the defendant, Paul Withrow, in his alleged molestation of prosecutrix, an infant female, by the use of his tongue, actually penetrated the body of prosecutrix, and thereby committed the statutory crime of cunniligius. See *State* v. *Murry,* 136 La. 253, 66 So. 963, 965; and Black's Law Dict. 4th ed., 456.

As the heart of Code, 61-2-15, defining the crime of rape and the penalties therefor, as well as Code, 61-8-13, defining statutory sodomy, is "carnal knowledge", it is important to note, as this Court held by its order of November 25, 1952, in *State* v. *Hannigan,* and in *State* v. *Brady, supra,* that in a criminal prosecution for rape, as well as in a criminal prosecution for sodomy under the respective statutes, penetration is necessary. In *State* v. *Friedman, supra,* a prosecution for sodomy, this Court drew an analogy to Code, 61-2-15, defining rape, and held in the following language that in a prosecution for sodomy emission by a male person is unnecessary: "As to point five, we are of the opinion due to the fact that

emission of semen under our cases need not be shown in a prosecution for rape, and that the statute defining sodomy is phrased in practically identical language as that defining rape, that the emission of semen need not be alleged nor proven in a prosecution for the latter offense." And by the analogy drawn in the *Friedman* case with Code, 61-2-15, we reiterate our holding in the order of the Court in the case of *State* v. *Hannigan,* Case No. 10842, and hold here that penetration is a necessary element of the offense of sodomy and the other inhibited crimes against nature provided for in Code, 61-8-13.

To the effect that, as in a prosecution for rape, an essential element of the offense of sodomy is penetration, and in a prosecution for sodomy it is not necessary to allege or prove the emission of semen, see 16 M. J., Sodomy, Section 2.

In these circumstances the jury was not entitled to find beyond a reasonable doubt that such penetration was had. An essential element of sodomy being absent from this record, this Court for this reason is required to reverse the judgment of conviction, set aside the verdict of the jury, and grant the defendant a new trial.

Inasmuch as under our holding this case may be tried a third time, we in the interest of justice will address ourselves *in seriatim* to grounds of error Nos. 3, 4, 5, 6, 7, 8, and 10, as hereinabove set forth.

Ground No. 3 is to the effect that the trial court erred in admitting the evidence of the prosecutrix, over the objection of the defendant, because her competency was not established. This ground is without merit. To establish prosecutrix as a competent witness, her teacher testified that she was "very level-headed, above the average in intelligence"; and further in the establishment of prosecutrix as a competent witness, she was questioned by Assistant Prosecuting Attorney Charles Walker as follows:

"Q. Do you go to Sunday School?

"A. Yes.

"Q. Where?

"A. Pilgrim Holiness Church.

"Q. Mr. Caudy, the Clerk, had you hold up your hand and you swore to tell the truth?

"A. Yes.

"Q. Do you know what it means?

"A. Yes.

"Q. What does it mean?

"A. It means to tell the truth, the whole truth; if you don't, God will put a black mark by your name."

In point 2 of the syllabus of the case of *State* v. *Farley*, 125 W. Va. 266, 23 S. E. 2d 616, this Court held: "The competence to testify of a child eight years old is a matter that rests largely in the discretion of the trial court, the exercise of which will not be disturbed unless shown to have been plainly abused." In the body of the opinion in the *Farley* case at page 273, this Court observed: "This child stated that she realized she would go to 'the boogerman' if she didn't tell the truth, and on her examination refused several times to respond to questions which she said she did not understand until they were explained. We are of the opinion that no abuse of the trial court's discretion is shown."

Likewise defendant's assignment of error No. 4, to the effect that the trial court erred in admitting the evidence of State's witness, Mabel Carnes, over the objection of the defendant, in regard to what was told to her by the prosecutrix, is not ground for reversal of the judgment of conviction. This evidence was admissible under the rule of *res gestae,* which is a well-established exception to the hearsay rule. The record discloses that shortly after prosecutrix was molested in the girls' restroom, she ran upstairs to Mrs. Carnes in a highly emotional condition - in fact she was crying. She then told Mrs. Carnes that "she couldn't tell [her] in front of the boys and girls." Counsel for defendant's position is,

as stated on page eleven of his brief, that the prosecutrix' statement to Mrs. Carnes lacked spontaneity, so as to prevent the application of the doctrine of *res gestae*. This position fails to take into consideration the circumstances which establish spontaneity in prosecutrix' remarks to her teacher: (a) Mrs. Carnes testified that prosecutrix "* * * came to me crying"; and (b) only a short period of time had elapsed between the alleged occurrence in the girls' restroom of the school and the meeting with her teacher.

In a well-reasoned note to *State* v. *Quinnild*, 231 Minn. 99, 42 N. W. 2d 409, 19 A. L. R. 2d 573, note pages 579 to 604, entitled "Time element as affecting admissibility of statements by victim of sex crime as res gestae", at page 584 it is stated: "In determining the general question of spontaneity, it is practically impossible to completely disassociate the time element from the other elements, factors, or circumstances surrounding each particular case. In fact, the courts have refused to fix definite limitations as to the time of utterance, but have considered the element of time in relation to all the surrounding circumstances." On page 583 of the note it is stated: "The time element involved in a particular case cannot be disassociated from other elements involved therein, such as the condition of the victim, the fact that the declarations were made at the first opportunity or to the first person met, or the fact that they were made in response to inquiries. The presence or absence of such factors may account to some extent for different results reached in cases where the time element involved was the same." It would seem to be perfectly natural for this little girl, when she encountered her teacher in the classroom, she being the first person she met after her alleged molestation, in her embarrassment to hesitate to make the statement to Mrs. Carnes before the boys and girls in the classroom, which Mrs. Carnes testified she made to her in the hall immediately after prosecutrix came crying into the classroom. Clearly this is a case where the trial court did not abuse its discretion in the admission of this evidence.

As defendant's assignment of error No. 5, to the effect that the court erred in admitting evidence in answer to questions propounded to the defendant's witness, Lillian Whited, by the prosecuting attorney on cross examination, over objection of defendant, in regard to her association and relations with defendant; and defendant's assignment of error No. 6 to the effect that the trial court erred in admitting the evidence of Delbert C. Stover, over objection of the defendant, in regard to what Lillian Whited told him about having had unnatural sex relations with the defendant, are interrelated, they will be considered together.

The only possible ground for the admissibility of the testimony of Sergeant Delbert C. Stover, read in connection with the testimony of Mrs. Whited, is that Stover's testimony goes to the credibility of Mrs. Whited's testimony. Mrs. Whited testified, without objection, that she told Sergeant Stover that she had had normal relations with the defendant; but Sergeant Stover testified, over objection of the defendant, that she admitted to him that she had had *unnatural sexual* relations with the defendant. Clearly, Sergeant Stover's testimony is inadmissible, because a sufficient foundation has not been laid for an attack on the credibility of Mrs. Whited's testimony. The examination of Mrs. Whited had her admit that she had "normal relations" with Paul Withrow, by which she may have meant relations other than sexual relations; whereas the testimony of Sergeant Stover is to the effect that she admitted to him that she had "unnatural sex relations" with the defendant. Mrs. Whited's testimony furnishes no sound basis for the admission on cross examination of the testimony of Sergeant Stover. If there were not the failure of the State to prove beyond a reasonable doubt that the defendant penetrated the sex organs of the prosecutrix, the admission of Sergeant Stover's testimony, having as it had no basis, was clearly inadmissible; and the trial court erred in permittinig that testimony to be admitted, over objection. Moreover, the

testimony of Sergeant Stover is inadmissible under the rule stated in point 3 of the syllabus of *State* v. *Gargiliana,* 138 W. Va. 376, 76 S. E. 2d 266, which reads: "Evidence of a separate and distinct offense can not be admitted upon a trial of a criminal charge, unless the separate and distinct offense tends to establish motive, scheme or intent, then in issue, and is similar, near in point of time, and has some logical connection with the offense for which the defendant is being tried"; and in point 1 of the syllabus of *State* v. *Craig,* 131 W. Va. 714, 51 S. E. 2d 283.

Defendant's assignment of error No. 7 to the effect that the trial court erred in giving State's Instruction No. 2, because that instruction instructed the jury that if they believe from the evidence beyond a reasonable doubt that the defendant, Paul Withrow, either forced or persuaded the prosecutrix to permit him to place his mouth on her vagina, and that the defendant did penetrate the prosecutrix' vagina with his tongue, the jury must find the defendant guilty as charged in the indictment. The giving of this instruction was clearly erroneous, but was not prejudicial error, because it required the jury to find a greater degree of penetration than that necessary to establish the crime of sodomy *per os.* The part of the instruction which permits the jury to find that the defendant either forced or persuaded the prosecutrix did not render the instruction prejudicially erroneous, because the prosecutrix testified that she was fighting when the defendant "put his mouth against my privates"; and in answer to the question: "And that was all he did, put his mouth against your privates", she answered, "Yes, his mouth and his tongue."

Defendant's assignment of error No. 8 is to the effect that the court erred in giving State's Instruction No. 1, which instruction told the jury that proof beyond a reasonable doubt "does not necessarily mean proof without contradiction or without conflict, but, if after considering all the evidence and circumstances produced in the case, you can say that you have an abiding con-

viction in the truth of the charges contained in the indictment, then you are satisfied beyond a reasonable doubt, and should find the defendant guilty." This instruction properly informed the jury as to what constitutes "beyond a reasonable doubt."

The matters complained of in defendant's assignment of error No. 10, to the effect that the court erred in refusing to give defendant's Instruction No. 5, have heretofore been fully discussed in defendant's assignments of error Nos. 1, 2, 9 and 11. This disposes of all of defendant's assignments of error.

For the foregoing reasons we reverse the judgments of the Intermediate and Circuit Courts of Kanawha County, set aside the verdict of the jury in the Intermediate Court of Kanawha County, and remand this case to the Intermediate Court for a new trial.

*Judgments reversed;*
*verdict set aside;*
*new trial awarded.*