# CHARLESTON.

STATE v. JENNINGS HUNTER

(No. 5778)

Submitted March 8, 1927.   Decided March 15, 1927.

1.  CRIMINAL LAW—*Mere Suspicion of Guilt Will Not Sustain Conviction.*

   Mere suspicion of guilt arising from evidence which does not prove the actual commission of the crime charged, is not sufficient to sustain a conviction.   (p. 377).

   (Criminal Law, 16 C. J. §§ 155 [Anno]), 1579.)

2.  CRIMINAL LAW—LARCENY—*Where State's Evidence is Wholly or Partly Circumstantial, Accused is Entitled to Acquittal, Unless Guilt is Proved to Exclusion of Every Reasonable Hypothesis of Innocence; Evidence Held Insufficient to Sustain Conviction of Larceny of Hogs.*

   Where the evidence relied on to convict one of crime is in whole or in part circumstantial, the accused is entitled to an acquittal unless the fact of guilt is proven to the actual exclusion of every reasonable hypothesis of innocence.   (p. 378).

   (Criminal Law, 16 C. J. §§ 1568, 1580; Larceny, 36 C. J. § 483.)

   (NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Greenbrier County.

Jennings Hunter was convicted of the larceny of hogs, and he brings error.

*Judgment reversed; verdict set aside; new trial awarded.*

*Jarrett & Driscoll,* for plaintiff in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

MILLER, JUDGE:

Defendant was convicted of the larceny of a sow valued at $25.00 and two shoats of the value of $15.00. The error assigned is the refusal of the trial court to instruct the jury that the defendant was not guilty of grand larceny, because the State failed to prove that the sow known to have been in his possession was the one lost by or taken from the prosecuting

witness L. J. LeMasters, and the court's refusal to set aside the verdict of the jury on defendant's motion based on the same ground of lack of proof of a felony.

The State's evidence is that in the fall of the year LeMasters turned out on the mast or acorns near his home a black sow and her two pigs. He had purchased the sow from Kenneth McMillion about three years before; and at that time she was marked by a crop off of each ear. LeMasters' mark was a crop off the right ear and an underbit or underkeel in the same ear. After purchasing the sow LeMasters put an underkeel in her right ear, and before turning the three hogs out on the mast he marked the two pigs by cropping and marking with an underkeel the right ear of each. The three hogs were afterwards seen in the vicinity of McMillion's home, some two miles from where LeMasters lived. LeMasters says that when he failed to find the hogs, upon learning that defendant had been seen driving a sow and two shoats from near McMillion's place and over the mountain to his home, he went to defendant's place, which was some ten miles distant, but that the latter denied having driven any hogs over the mountain from near the vicinity, he returned to defendant's home, and was shown two shoats in a pen, one of which looked like his pig; but that he could not have sworn they were his pigs because their ears had recently been "cut half or more," and the pigs were still covered with blood. He made two or three later trips to look at the pigs and finally decided they were his. It does not appear whether the ears of these pigs were cut down far enough to destroy LeMasters' underkeel, if he had in fact so marked them. On the fourth trip LeMasters took with him two members of the state police force and one Golden Jones. He and Jones testified that when they approached Hunter's place, the latter ran rapidly up the mountain calling back to some one to "get the hogs in the clear." The state police were not called as witnesses. Other alleged suspicious circumstances are relied on by the State; that defendant drove the hogs home in the nighttime, a distance of some ten miles, and slaughtered the sow the next day, and that he cut a part of the pigs ears off and put them up in a

pen. The witness Bob Walkup testified that while searching for one of his hogs in the vicinity of the place where the hogs driven home by defendant were afterwards found, he saw these hogs and reported the fact to defendant. Walkup assisted Hunter in driving the hogs home and in slaughtering the sow.

Defendant introduced the witness Richard Price, who testified that he had sold Hunter a "right black sow" in March 1923, marked with "a crop off the left ear and a swallow-fork in the right." Defendant testified that his hog mark was a crop off each ear, to which he had changed from a crop off the left ear about eighteen months before, because a neighbor, Stuart Remley, used the same mark. In this he was corroborated by Remley. Defendant says he turned the sow purchased from Price out on the commons some time in the summer and afterwards saw her with two pigs "back toward Garner Ridge." Bawley Tyree testified that after the time defendant was said to have driven the three hogs home, he saw a black sow and three shoats near the Garner place, marked with a "crop off the right ear and underkeel." LeMasters explained this by testifying that these hogs belonged to his father-in-law, who had "made a mistake in marking and he first put a crop underneath the ear through a mistake and then put one on top." The father-in-law was not a witness in the trial.

The question arises: Could the jury infer beyond a reasonable doubt that the hog driven home and slaughtered by defendant was the sow owned by LeMasters? There was no direct identification of the sow by LeMasters or any other witness. No witness who knew or had seen the LeMasters hog and the one shown to have been in defendant's possession testified on the question. The only evidence before the jury was that of the circumstances surrounding the affair. The State relies principally on the suspicious acts of the defendant, and the fact that LeMasters and others of his family identified the shoats. The fact that defendant drove the hogs home in the nighttime, and slaughtered her the next day, and that he denied to LeMasters having driven any hogs over the

mountain, and ran when the officers approached his home, if true, are circumstances tending to arouse suspicion; but mere suspicion arising from evidence which does not prove the actual commission of the crime charged, is not sufficient to sustain a conviction. *State* v. *White,* 66 W. Va. 45; *State* v. *Chafin,* 78 W. Va. 140; *State* v. *Mininni,* 101 W. Va. 611; *Henderson* v. *Com.,* 98 Va. 798.

There is no conflict in the material evidence bearing on the question of guilt. All the State's evidence might be true, and the defendant yet be innocent; for the evidence does not necessarily exclude every reasonable hypothesis but that of guilt. The accused is entitled to an acquittal unless the fact of guilt is proven to the actual exclusion of every reasonable hypothesis of innocence. "In order to sustain a conviction based in whole or in part on circumstantial evidence, all of the circumstances from which the conclusion of guilt is drawn, and without which it cannot be drawn, and every essential circumstance necessary, must be established by full proof, and must be consistent with the hypothesis of guilt and exclude every other reasonable hypothesis of innocence." *State* v. *Mininni, supra; State* v. *Bennett,* 93 W. Va. 548; *State* v. *Dudley,* 96 W. Va. 481; *State* v. *Gilfillen,* 96 W. Va. 661.

The judgment will be reversed, the verdict of the jury set aside, and the defendant awarded a new trial.

*Judgment reversed; verdict set aside; new trial awarded.*