STATE OF WEST VIRGINIA

*v.*

JAMES CLAY

(No. 10307)

Submitted January 23, 1951.   Decided March 13, 1951.

*F. F. Scaggs,* for plaintiff in error.

*William C. Marland,* Attorney General, *George W. Stokes,* Assistant Attorney General, for defendant in error.

FOX, PRESIDENT:

At the March term, 1950, of a Grand Jury of Wayne County, an indictment was returned against James Clay,

under the provisions of Code, 61-3-5, charging that on the 11th day of December, 1949, in said county, he did then and there wilfully, maliciously, feloniously and unlawfully set fire to and cause to burn certain chattels and personal property, to-wit: a certain lot of household and kitchen furniture and other articles used in housekeeping, the personal property of Exa Clay, and specifically enumerated in the indictment, with intent then and there to injure and defraud certain insurance companies, named in the indictment, by virtue of certain policies of insurance issued to the said James Clay, which policies were on said date in full force and effect. On April 3, 1950, a demurrer was interposed to the said indictment, and overruled. The case was then tried before a jury, resulting in a verdict that: "We the jury agree and find the defendant guilty as charged in the within indictment." A motion to set aside the said verdict, and grant a new trial, was made on April 5, 1950, and overruled, and on the same day he was sentenced to the penitentiary of this State at hard labor for the full term of one to five years. To this judgment this Court, on July 3, 1950, granted this writ of error.

The errors assigned in the petition for a writ of error may be stated as follows: (1) Error in overruling defendant's demurrer to the indictment; (2) error in permitting Exa Clay, wife of the defendant, to testify as a witness against him; (3) error in permitting Exa Clay to testify as to certain nonsupport proceedings involving James Clay, her husband; (4) error in refusing to set aside the verdict of the jury on the grounds of variance between the allegations and proof, and on the further ground that illegal, inadmissible evidence was permitted to be introduced by the State, over the objection of petitioner; (5) in refusing to set aside the verdict of the jury, and grant the defendant a new trial on the ground that the State wholly failed to introduce any evidence connecting the petitioner with the crime charged; and (6) for the errors apparent upon the face of the record.

The questions raised by these assignments of error can-

not be answered without referring to a number of acts and circumstances which may or may not be important to a decision on this writ of error. The defendant and Exa Clay were husband and wife, and at one time lived in a three room cottage on land owned by R. L. Drown in Wayne County, and apparently lived there for some years. It appears that they had accumulated some household furniture and equipment, and had, in connection therewith, incurred certain indebtedness. About February, 1948, a rift in their domestic relations seems to have developed, and Exa Clay had a nonsupport warrant issued against her husband, on which a hearing was held, and James Clay was required to pay to Exa Clay $25.00 a month for the support of herself and the child born of the marriage between Exa Clay and James Clay. At that time, the evidence discloses that there was an attempt to divide some of the personal property located in the building in which they then resided, and an assumption by James Clay of certain indebtedness, and by Exa Clay of other indebtedness. In the trial on the indictment, one of the questions supposed to be involved was the ownership of the destroyed property described in the indictment. Evidence was introduced in the case for the evident purpose of qualifying Exa Clay as a witness against her husband in the trial of the indictment. We can see no other reason why that proceeding had any bearing whatever on the guilt or innocence of James Clay of a wrongful act allegedly committed more than a year and a half later:

Said parties did not thereafter live together as husband and wife. Exa Clay remained in the Drown house, and James Clay made his headquarters, and probably lived, with his mother in a house located some six or seven hundred yards from the Exa Clay house.

The next thing that happened was on September 13, 1949, when James Clay procured in his name from the Camden Fire Insurance Association, a fire insurance policy in the amount of $2,000.00 on the household property located in the cottage in which Exa Clay, his wife, then

lived, but representing it to be his own. On September 20, 1949, he procured a similar policy from the Glen Falls Insurance Company, in the amount of $1,500.00, which covered the same property; and on November 28, 1949, he procured, from the Homeland Insurance Company of America, a like policy, in the sum of $1,500.00, making an aggregate of $5,000.00, and all of which policies were in force and effect on December 11, 1949. The evidence is that the property covered by these insurance policies was worth approximately $1,000.00, and after the fire, charged in the indictment, the defendant attempted to collect on these policies, and made an estimate of the property covered by said policies as worth $3,000.00. It is unnecessary to go into detail, but it is quite apparent that in his attempt to collect on these policies, defendant grossly overestimated the value of the property insured.

A short time after he had obtained these policies of insurance, Exa Clay instituted some character of proceeding to require James Clay to comply with the order of the justice of the peace in relation to the nonsupport charge, aforesaid, and on the 10th of December, 1949, Clay was served with a summons in that proceeding. That same afternoon Clay visited the home of Exa Clay, apparently in connection with the summons that had been served on him. While there he made some remark about getting rid of his wife, and she says punched her in the ribs; and then left the Exa Clay home in the direction of his own home. A little later a number of shots were fired from the direction in which James Clay had gone, some of said shots striking the Exa Clay home, causing her to be alarmed for the safety of herself and the children, and causing her to get her children together and go to the home of a relative. She testifies that before leaving her home she disconnected the electricity; that there was no fire in the kitchen; but that she left a coal fire burning very low in a stove in another room in the said building. Between 6:00 and 7:00 o'clock in the afternoon of December 11, the building was seen to be burning, and persons passing it went to the window and saw

the fire burning inside the building all around the rooms from the floor upwards. A witness, A. W. Smith, who had some experience in connection with fires, testified: "I never saw one burn exactly like that where they caught fire from my experience.", and "You generally see it in one location." Smith's testimony is corroborated by that of Joe Furguson. One witness testifies that he saw the defendant at his mother's home about 4:15 on one Sunday evening before Christmas. This witness says that he was at the home of James Clay on two Sundays before Christmas, and that on one of said dates James Clay was present, and on the other date he was not. This makes his testimony of no value.

When asked where he was on December 10, the night before the fire, the defendant testified that he visited one Leslie Pauley; that he got there about 5:00 o'clock; that they went to a show at Ashland, and he stayed at Pauley's home that night; that he left Pauley's the next day about 1:00 o'clock, and went to the home of his sister in West Moreland, arriving there a few minutes after 1:00 o'clock; that he stayed at his sister's home until about 5:30 and then started to a show at the State Theater in Huntington; that he drove up to 13th Street to the Green Gables Restaurant, stopped there about twenty minutes, and then got in his truck and went to Fourth Avenue, (presumably in Huntington), parked his truck between 7th and 8th Streets, went up to the State Theater and saw a show which he identified as "Broad of Fear", and stayed in the show until around 9:00 o'clock; that he came out of the State Theater, started down Fourth Avenue where his truck was parked and ran across Ralph Saunders, a bus driver, and talked to him some three or four minutes; then walked on down to his truck and drove home, arriving there about 10:30 P. M.; that, in the meantime, his mother had gone home; that he then went to bed, and the next morning saw that the Drown House had burned, and was told by the neighbors to stay away. He is corroborated, to a considerable extent, as to his movements on the day of the fire, but the jury apparently did not

accept the testimony of these witnesses as establishing the alibi claimed by the defendant, and, notwithstanding all this testimony, found the defendant guilty, as charged in the indictment.

Inasmuch as this case will have to be retried, we do not deem it advisable to discuss in detail the evidence bearing upon this alibi. Before discussing the legal questions involved, we think it well to incorporate in this opinion the statute under which the indictment in this case was returned. It reads as follows:

"Any person who wilfully and with intent to injure or defraud the insurer sets fire to or burns or attempts so to do or cause to be burned or who aids, counsels or procures the burning of any building, structure or personal property, of any class or character, whether the property of himself or of another, which shall at the time be insured by any person against loss or damage by fire, shall be guilty of a felony and upon conviction thereof, be sentenced to the penitentiary for not less than one nor more than five years."

The indictment in this case was, apparently, prepared on the theory that it was necessary to charge ownership of the personal property intended to be destroyed, no doubt by analogy to the requirement that in larceny indictments ownership of property of living persons, firms or corporations must be alleged. Following up that theory, evidently the State believed that it must prove ownership of the personal property located in the destroyed building, and Exa Clay was named as the owner thereof. Further, following this theory, testimony was introduced as to the agreement which had been made between James Clay and his wife in February, 1948, when the nonsupport proceeding was tried. Only on that theory can the provisions of the statute, which permits a wife to testify against a husband, without his consent, be permitted. The statute relating to husband and wife testifying in criminal cases, Code, 57-3-3, reads:

"In criminal cases husband and wife shall be allowed, and, subject to the rules of evidence

> governing other witnesses, may be compelled to testify in behalf of each other, but neither shall be compelled, nor, without the consent of the other, allowed to be called as a witness against the other except in the case of a prosecution for an offense committed by one against the other, or against the child, father, mother, sister or brother of either of them. * * *"

The theory of the State is that the wife was a competent witness in this case, because in the burning of the personal property belonging to her, an offense, within the meaning of the statute, was committed against her, and about which she could testify over the objection of the husband. The position of the defendant is that the word "offense", as used in the statute, means some personal assault, and does not apply to a case where the offense charged involves the destruction of personal property of the wife. In the case of *Meade* v. *Commonwealth*, (Va.), 43 S. E. 2d 858, under the statute which provides that neither spouse should be allowed, without the consent of the other, to be called as a witness against the other, in a case involving prosecution of an offense allegedly committed by the husband, it was held that: "In prosecution for forgery of defendant's wife's signature to deed and utterance of forged instrument, wife was incompetent to testify against defendant." This Court is not in accord on the meaning of our own statute quoted above, but a majority are of the opinion that the word "offense", as used in our statute, does not include the act of destroying personal property of a wife. The Court being of that opinion, necessarily finds that the wife was an incompetent witness to testify against the defendant in this case, without his consent; that it was error on the part of the trial court to permit her to testify against her husband; that all of her testimony should have been stricken; and that in permitting such testimony to go to the jury, the trial court committed reversible error against the defendant.

The statute, under which defendant was indicted, is one providing a penalty for committing an act with

intent to defraud an insurance company or insurance companies, and the matter of the ownership of the property is of no importance. In that view of the case, it was not important whether James Clay or Exa Clay was the owner of said property or any part thereof. The offense was the destruction of property, with intent to defraud, which brings us to the final question whether the evidence in the case, exclusive of the testimony of Exa Clay, or, for that matter, including her testimony, sustains the verdict of the jury.

In our opinion, the evidence fully sustains the finding of the jury that the fire which destroyed the building in which Exa Clay lived, together with its contents, was of incendiary origin. The only testimony on the question is that of the witnesses who first saw the fire while it was burning around the rooms. There is no denial or explanation of that situation which strongly tends to establish the theory that the fire occurred through the direct and intentional act of some person, and did not originate otherwise. We think the motive, on the part of the defendant, to burn this building and its contents, is clearly established. The act of the defendant in grossly overestimating the value of this property, and in obtaining insurance far beyond the actual value of the property, probably as much as five times, indicates an intent to profit in some way, and the only conceivable way in which he could profit was to set fire to the building or have someone else to do so. It was quite natural that the finger of suspicion should point in the direction of the defendant as the one person in the world to whose interest it was to have this building burned and its contents destroyed.

But suspicion, however strong, is not enough. *State* v. *White,* 66 W. Va. 45, 66 S. E. 20; *State* v. *Chafin,* 78 W. Va. 140, 88 S. E. 657; *State* v. *Beall,* 98 W. Va. 189, 126 S. E. 569; *State* v. *Hudson,* 128 W. Va. 655, 37 S. E. 2d 553. The State must go farther, and in some manner connect the defendant with the actual commission of the crime. This may be done by circumstantial evidence, and it is not

necessary that the defendant be seen around the premises where the crime is committed, and, in this case, in a position where he could have ignited the fire. There must, however, be something connecting him in a personal way with the actual burning of the building before we can say that the charge of his burning the building is established beyond all reasonable doubt. If the evidence be wholly circumstantial, then it must be of a character which excludes every reasonable hypothesis except the one on which the conviction is based. In *State v. Beall, supra,* this Court held:

> "Where a conclusion of guilt is based upon circumstantial evidence, it is essential that the evidence should beyond all reasonable doubt actually exclude every hypothesis but the one on which the conviction is based."

See also *State v. Stutler,* 115 W. Va. 393, 176 S. E. 426; and *State v. Cutlip,* 131 W. Va. 141, 46 S. E. 2d 454, where the ruling in *State v. Beall* is directly followed by a quotation of Syllabus Point No. 2 from the *Beall* case. The defendant may be guilty. He had every possible incentive to destroy the building, and particularly its contents, because he stood in a position where he would profit greatly thereby if he should be able to collect the fire insurance he obtained on the personal property located in said building. He may or may not have been the actual perpetrator of the crime, or he may have secured someone else to commit it, and if proof of either had been established beyond all reasonable doubt, the verdict of the jury should be upheld. Here we have nothing but proof of his fraudulent manipulations in obtaining the insurance policies, and the fact that shortly thereafter the property insured was destroyed by fire. No witness places him at or near the scene of the crime within twenty-four hours of its commission, and the testimony of the witnesses who placed him elsewhere is not attempted to be disproved. Only suspicion remains, and this Court cannot act solely on suspicion. Suspicion must be upheld by testimony or clear circumstances

which leave no hypothesis but that of guilt. The justified suspicion which the jury must have had, and which, by its verdict, it converted into a belief that the defendant was guilty of the crime alleged against him beyond all reasonable doubt, cannot be accepted by this Court as sufficient to uphold the verdict returned by it. We cannot say that the evidence in this case excludes every reasonable hypothesis that the burning was not committed by someone other than defendant, or by accidental means; and the proof, such as there is, being wholly circumstantial, does not rise to the exclusive nature required for a conviction.

All this being true, the judgment of the Circuit Court of Wayne County is reversed, the verdict set aside, and a new trial awarded.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*