STATE OF WEST VIRGINIA

*v.*

FREDDIE JOE NOE

(No. 13650)

Decided December 21, 1976.

*Herbert H. Henderson* for plaintiff in error.

*Chauncey H. Browning*, Attorney General, *Betty L. Caplan*, Assistant Attorney General, for defendant in error.

WILSON, JUSTICE:

On July 19, 1974, a jury in the Circuit Court of Cabell County found Freddie Joe Noe guilty of the first degree murder of Donna Gail McClung and recommended mer-

cy. His motion to set aside the jury verdict was denied by the Circuit Court of Cabell County by order entered June 6, 1975. Noe appeals claiming that the trial court committed various errors involving: the sufficiency of fingerprint evidence; the admissibility of certain evidence; the withholding of certain evidence; the propriety of the prosecutor's final argument; and instructions.

We award Noe a new trial primarily because the confused state of the evidence regarding fingerprints casts serious doubts on its legal sufficiency to sustain a conviction. However, we have also found error in connection with the admission of certain opinion evidence and in connection with the prosecutor's closing argument. We do not consider any contention regarding errors in instructions. No specific errors concerning instructions were assigned, briefed or argued. Therefore, they are deemed waived.

Donna Gail McClung, a young wife, mother, student and part-time employee of the library at Marshall University, left the library at about 6:00 p.m. on August 26, 1971, and was found dead in her apartment, No. 13, at 306 18th Street in the City of Huntington, during the mid-afternoon of August 29, 1971.

When found, the body of the deceased was lying on the floor on its back with the legs widely spread. The body was clad only in a dress which was pulled up above the breasts. White panties were on the floor close to the right foot, and a sanitary napkin was on the floor close to the buttocks.

An autopsy was performed on August 29, 1971. It was determined that death was caused by manual strangulation and had occurred two or three days prior to the autopsy. There was no evidence of sexual intercourse.

Apartment No. 13 had been occupied by decedent and her husband, Gordon William McClung, for about a year.

Noe and his wife occupied an adjoining Apartment, No. 12, but before their marriage, Mrs. Noe had occupied Apartment No. 13.

Access to Apartments Nos. 12 and 13 was by a common hallway, and on the exterior of the building, the two apartments had adjoining balconies separated by a distance of only a few inches.

Testimony showed that Noe had visited with decedent's husband in Apartment No. 13, at least on a few occasions; that Noe had turned over to Mr. McClung a key to Apartment No. 13 which apparently was one which had been inadvertently retained by Mrs. Noe after she had vacated it; that on one occasion, Noe went to Mr. McClung's place of employment to get McClung's keys because Mrs. McClung had locked herself out of the apartment.

There is no evidence showing any particular association between Noe and Donna Gail McClung at any time. There is no evidence of any incidents, pleasant or unpleasant, between them. There is no evidence, specifically, showing the whereabouts of Noe at any time between August 26, 1971, when Donna Gail McClung left the library and August 29, 1971, when she was found dead. There is no physical evidence by means of which Noe was shown to have participated in any acts which caused the death of Donna Gail McClung.

The principal evidence upon which the State relies for conviction is fingerprint evidence. It is the deficiency in this evidence upon which the defense relies for reversal.

During their investigation of the death of Donna Gail McClung, the police authorities searched for fingerprints in the McClung apartment and on both sides of the doors leading to and from the external balcony. Various fingerprints were found on both sides of a pane of glass in the balcony door.

The attention of the police became focused on this pane of glass when it was noticed, two or three days after the discovery of decedent's body, that one strip of moulding at the top of one glass panel on the outside of the door was missing. One of the remaining pieces of

moulding was loosely held by a nail, and there was nothing securing the other two pieces of moulding.

Having determined that there were fingerprints on both sides of the glass, the police proceeded to remove this one glass panel, lifted the prints from it and transferred them to two 3 x 5 cards. These two 3 x 5 cards were admitted as State's Exhibits Nos. 11 and 12. Each exhibit contains writing. The writing on Exhibit 11 indicates that the fingerprint is "off of glass taken from rear door of Apt. 13" and the writing on Exhibit 12 indicates that the fingerprint is "off of glass taken out of rear door to Apt. 13." There is other writing on the two exhibits but we cannot tell the significance or propriety of it, and we do not consider it.

When Noe was arrested, a full set of his prints was taken by rolled impression, and the card containing this full set of his prints was introduced into evidence as Exhibit No. 14.

The State's fingerprint expert testified that one of the latent prints on State's Exhibit No. 11 was the same as the right middle finger of the print contained on the card of Noe's prints as shown in State's Exhibit No. 14 and that one of the latent prints contained on State's Exhibit No. 12 was the same as the right thumb print shown on Noe's fingerprint card being State's Exhibit No. 14.

It is important to note that State's Exhibits Nos. 11 and 12 containing prints which were lifted from the pane of glass contained a total of two prints and three partial prints. One print and one partial was on one of the exhibits, and one print and two partials were on the other exhibit. We cannot tell which of the two exhibits contained the one print and one partial and which contained the one print and two partials. We cannot tell whether the prints and partials on State's Exhibits Nos. 11 and 12 were taken from the same or opposite sides of the glass.

The officer through whom State's Exhibits Nos. 11 and 12 were admitted had, prior to their admission, testified

at length regarding the direction of various fingerprints on the pane of glass, that they were on opposite sides of the glass and that one of them extended down behind one of the pieces of moulding. However, the State's evidence as introduced fails to establish that the fingerprint which extended beneath a piece of moulding was either of Noe's fingerprints and fails to establish that Noe's two fingerprints were on opposite sides of the glass.

Thus the only fingerprint evidence really is merely that a print of Noe's right thumb and a print of his right middle finger were on a pane of glass in the doorway of the McClung apartment. Regardless of what the State may have known or may have assumed, that is all that the State's proof amounts to. This confusion or lack of certainty when combined with the unidentified partial prints contained on State's Exhibits Nos. 11 and 12 scarcely justifies the State's argument that Noe had removed the moulding from the glass panel and had removed the glass pane in the doorway so that he could and did gain access to the decedent's apartment at the time of the crime.

The fingerprint evidence being circumstantial evidence must be carefully scrutinized. It is certainly sufficient to show the defendant's presence at some time at the balcony doorway to the McClung apartment. In view of the testimony of Mr. McClung that he and his wife had cleaned the panes of glass in the doorway leading to the balcony at some time around the middle of June, 1971, the existence of the fingerprints on a panel of glass is even sufficient to show the presence of the defendant at that doorway at some time between the middle of June and the time after decedent's body was discovered when the police authorities lifted the latent prints from the pane of glass. It does not show the presence of the defendant at any particular time. Specifically, standing alone, it does not show the presence of the defendant at any time between August 26 when the decedent left the library and August 29 when her body was found.

The State, in reliance upon *State v. Bailey*, 151 W. Va. 796, 155 S.E.2d 850 (1967), contends not only that the weight of circumstantial evidence is a question for the jury but also contends that it is for the jury to determine whether the evidence excludes every reasonable hypothesis other than that of guilt. The State concludes that the trial court, therefore, properly left these matters for the determination by the jury and that the jury properly resolved them against Noe.

*State v. Bailey, supra,* cannot stand for the proposition that, in all instances, circumstantial evidence standing alone is sufficient to take the case to the jury. When a case depends entirely upon circumstantial evidence, the trial court must first make the determination that the circumstantial evidence is such that it will support a verdict of guilty.

The general rules regarding circumstantial evidence are well recognized in this jurisdiction. Briefly stated, circumstantial evidence will not support a guilty verdict unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create a mere suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction. *See State v. Allen,* 139 W. Va. 818, 82 S.E.2d 423, (1954); *State v. Clay,* 135 W. Va. 618, 64 S.E.2d 117 (1951); *State v. Cutlip,* 131 W. Va. 141, 46 S.E.2d 454 (1948); *State v. Hudson,* 128 W. Va. 655, 37 S.E.2d 553 (1946); *State v. Kapp,* 109 W. Va. 487, 155 S.E. 537 (1930); *State v. Snider,* 106 W. Va. 309, 145 S.E. 607 (1928); *State v. Ison,* 104 W. Va. 217, 139, S.E. 704 (1927); *State v. Whitehead,* 104 W. Va. 545, 140 S.E. 531 (1927); and *State v. Hunter,* 103 W. Va. 377, 137 S.E. 534 (1927).

The confused state of the fingerprint evidence as introduced in this case is such that it fails to meet the required tests. It does nothing more than create a suspicion of guilt and does not prove the actual commission of the crime charged. Furthermore, the State's fingerprint evidence, as presented, does not establish the fact of

Noe's guilt to the exclusion of every reasonable hypothesis of innocence.

Since we cannot say that such evidence is sufficient to sustain the conviction, we must accordingly reverse and award the defendant a new trial.

However, our decision is not predicated solely on the insufficiency of the fingerprint evidence. Certain other evidence was admitted which should have been excluded.

For example, Noe contends on this appeal that the court erred in failing to exclude from the jury's consideration the pathologist's opinion regarding sexual activity when that opinion was based solely on a photograph showing decedent's body at the scene of the crime. The pathologist had been qualified as an expert medical witness and had been accepted by the court as such. The theory which permits an expert witness to give an opinion is that the questions presented are of such a nature that persons generally would not be as competent to pass judgment thereon as the expert. *See,* Syllabus No. 5, *Norfolk & Western Railway Co. v. Christian,* 83 W. Va. 701, 99 S.E.13 (1919); and *Moore v. Shenandoah, Inc.,* 152 W. Va. 549, 566, 165 S.E.2d 113 (1968). When, however, the subjects being inquired into call for opinions regarding matters which are within the knowledge of persons of common experience and observation, expert opinion evidence is not admissible. *See,* Syllabus No. 2, *Thrasher v. Amere Gas Utilities Co.,* 138 W. Va. 166, 75 S.E.2d 376 (1953); and Syllabus No. 4, *Overton v. Fields,* 145 W. Va. 797, 117 S.E.2d 598 (1960).

In this case, the pathologist was shown a picture of the body of the decedent as it was found. He was asked if he had an opinion on whether the position of the body was indicative of sexual activity. Defense counsel objected but the court permitted the doctor to say that "some type of sexual activity may have been attempted." After cross-examination which clearly established that such an opinion was not his medical opinion, and was not based on medical factors, defense counsel moved to

strike the doctor's testimony with reference to sexual activity. That motion was denied.

The doctor's testimony in this matter clearly went beyond his medical expertise. He had already testified that he found no evidence of rape and no evidence from which he could determine any trauma indicating any intercourse or attempted intercourse.

The court thus permitted the prosecution to suggest a sexual crime when there was in fact no medical evidence sustaining any such contention. The possibility of prejudice resulting from such an improper suggestion is so great in a crime such as this, involving the murder of a young and attractive female, that we must hold that the trial court should not have permitted the evidence to be introduced under the cloak of an expert's opinion in response to questions such as were asked by the prosecutor.

Two other assignments of error regarding evidence have been presented to us, but we do not consider them sufficiently meritorious to warrant extended discussion, and we do not rely upon them in reversing this case and awarding a new trial to the defendant. One of these assignments presents the contention that the prosecutor had withheld from defense counsel the strips of moulding taken from the door frame. It appears that the existence and availability of these strips of moulding were clearly revealed in an investigative report which had been disclosed to defense counsel. Thus, defense counsel had full opportunity to consider their significance, if any, and their use, if any, at trial. The other assignment of error upon which we do not rely for reversal is that the State at the trial made use of a copy of defendant's fingerprint record which had apparently been obtained from the military service. It is argued that such a record is hearsay and not admissible in view of the fact that it is not authenticated. Our reading of the record in this case discloses that the trial judge not only did not permit the introduction of this record into evidence but indeed went further and precluded questioning by the State with reference to that record.

However, we entertain a different view regarding the contention of the defendant that a portion of the final argument of the prosecuting attorney amounted to impermissible comment on Noe's failure to testify on his own behalf. Specifically, defense counsel moved for a mistrial on this ground after the prosecutor said "Now, Freddie Joe Noe can't have his cake and eat it, too. Now, you've either got an alibi or you don't."

The court denied the motion for a mistrial and construed the comment which was made by the prosecutor as a comment on the argument of counsel and not on the defendant's failure to testify. The court cautioned the prosecutor in firm language not to get into the area of the defendant's failure to testify and indeed directed the prosecutor to "stay away from it." However, the prosecutor's remarks regarding alibi can only be interpreted as a challenge to the defendant for not having presented an alibi defense. Specifically, it comments not only on defendant's failure to present the defense of alibi, but by inference, it comments on his failure to explain how his fingerprints got on the pane of glass.

In a criminal case a defendant is protected in his right not to take the stand by the Fifth Amendment to the *Constitution of the United States* and Article 3, Section 5 of the *Constitution of West Virginia*. Further, under the provisions of W. Va. Code, 57-3-6, his failure to testify shall not be the subject of any comment before the court or jury by anyone.

We recognize that a certain latitude must be given to an attorney either for the defense or for the prosecution in final argument. We are aware that the intensity of the moment may be productive of language which is intemperate or overdrawn. However, this can never justify disregard for constitutional and statutory guarantees either directly or by inference or innuendo.

Many of the errors with reference to evidence upon which the defendant relies on this appeal were unneces-

sarily promoted by the prosecution. The record demonstrates that the trial court was sensitive to these various questionable matters and endeavored to hold the prosecution in check. Indeed, on occasion the trial court actively intervened to prevent the prosecution from compounding errors which had already been made. However, we do not need to consider the cumulative effect of errors in view of our findings regarding specific prejudicial errors.

For the reasons expressed in this opinion, we reverse the defendant's conviction and remand this case to the Circuit Court of Cabell County for a new trial.

*Reversed, remanded, new trial granted.*