STATE OF WEST VIRGINIA

*v.*

JOSEPH DOBBS

(No. 13985)

Decided November 6, 1979.

*Franklin D. Cleckley* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Richard L. Earles,* Assistant Attorney General, for defendant in error.

HARSHBARGER, JUSTICE:

In the early afternoon of Sunday, November 4, 1974, Alfred Stewart was in his office at the May Company in Fairmont, West Virginia. His wife telephoned him at about 1:00 p.m. and he exclaimed that he was being robbed, whereupon she called the police, and friends who owned a sandwich shop near the office. They found Stewart dead with a bullet wound in his chest.

On January 27, 1975 at 1:00 a.m. two Clarksburg patrolmen noticed Joseph Dobbs driving an automobile with unique markings that attracted their attention, and watched him park it and enter a hotel. An hour later they were called to police headquarters because a young man had reported that he was molested by Dobbs. He said Dobbs offered him marijuana and had a revolver in his car. When the officers accompanied the young man to the hotel Dobbs attempted to hide, but the policemen stopped and searched him. They found a bag protruding from his pocket and smelled marijuana. Dobbs gave them the bag and was arrested for possession of a controlled substance.

As the police were taking Dobbs to headquarters, they passed the parked car and one patrolman saw a similar bag on the car floor.

At the police station Dobbs telephoned his niece in Fairmont, who owned the car, advising her to come for it, and by 3:00 a.m. two men arrived to get it. In the meantime, a narcotics agent has been summoned and while the two men were sent to the county jail for the auto's keys, the agent and a patrolman searched the car. The bag they had seen was empty; but they found a pistol under the front seat. The weapon was later identified by a ballistics expert as the weapon used to kill Alfred Stewart.

Joseph Dobbs was indicted for Stewart's murder and was found guilty of first degree murder with recommendation of mercy by a Marion County jury. He was sentenced to life in prison and we granted his motion for a writ of error and supersedeas.

The evidence essentially was this: the deceased's sister testified that, based upon her familiarity with May Company records through employment there as a bookkeeper, $464.00 was missing from the daily balance. Police photographs of the scene showed Stewart's body, and papers strewn about the office. However, the only two identifiable fingerprints obtained were Stewart's.

The State also presented three witnesses who were waiting for a bus in front of the office building when Stewart was killed. They had seen two black men enter and leave the building, and described articles of the men's clothing with particularity. One said the taller man was clean-shaven with an African hair style, and the shorter had a thin mustache. None of the three could positively identify Dobbs.

Several defense witnesses testified that they saw defendant on various occasions during 1974 and early 1975, and that during that time he was bearded. The defense introduced a photograph of the bearded defendant taken in August, 1974 by his niece who testified that the photograph represented his general appearance during that year. On rebuttal the State called a witness who testified to having seen Dobbs at 5:00 a.m. on November 5,

1974, without a beard, and a photograph which the witness had taken at that time and which portrayed defendant as beardless, was introduced.

The niece, owner of the car, testified that she loaned it to Dobbs around January 27, 1975; that she loaned it to various relatives and friends from time to time; that she did not consistently lock her car; and, that she had not cleaned it nor looked under the seats since July, 1974. Her husband testified that he had never placed nor seen anyone else place a gun in the car.

Three young men testified they were involved in an incident with defendant in July of 1974, wherein one of the men who lived and worked with him took his pistol. The other two saw it before it was returned to Dobbs. The witness who had taken it testified that it was the murder weapon, but recanted on cross-examination, stating that it "looked like" the murder weapon but that defendant's piece had less rust on it. One of the other witnesses testified that the guns were the same, the third testified that it "looked like" the same one but qualified his testimony by advising that it was dark when he saw it.

Another prosecution witness testified that he had seen the "butt part" of a pistol that defendant had told him was "my .38" in January of 1975, and that it "looked like" the murder weapon.

The evidence about the weapon and about defendant's race and beard is that upon which the State relied for conviction.

The burden is always on the state to establish by sufficient evidence, guilt beyond a reasonable doubt. *State v. Scurlock*, 99 W. Va. 629, 130 S.E. 263 (1925). As this Court wrote in *Pinkerton v. Farr*, ___ W. Va. ___, 220 S.E.2d 682, 688 (1975), "A lesser standard does not afford an accused due process of law under the Fourteenth Amendment."

In West Virginia, the standard guiding review of sufficiency of evidence is:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done. Syllabus Point 1, *State v. Starkey*, ___ W. Va. ___, 244 S.E.2d 219 (1978).

This standard applies to trial courts' consideration of motions for directed verdicts and to this Court. *See Addair v. Majestic Petroleum Co., Inc.*, ___ W. Va. ___, 232 S.E.2d 821, 824 (1977).

Moreover, in cases involving sufficiency of circumstantial evidence, there is an additional standard set in *State v. Noe*, ___ W. Va. ___, 230 S.E.2d 826 at 829 (1976):

> [C]ircumstantial evidence will not support a guilty verdict unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which creates a mere suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction. *See State v. Allen*, 139 W. Va. 818, 82 S.E.2d 423 (1954); *State v. Clay*, 135 W. Va. 618, 64 S.E.2d 117 (1951); *State v. Cutlip*, 131 W. Va. 141, 46 S.E.2d 454 (1948); *State v. Hudson*, 128 W. Va. 655, 37 S.E.2d 553 (1946); *State v. Kapp*, 109 W. Va. 487, 155 S.E. 537 (1930); *State v. Snider*, 106 W. Va. 309, 145 S.E. 607 (1928); *State v. Ison*, 104 W. Va. 217, 139 S.E. 704 (1927); *State v. Whitehead*, 104 W. Va. 545, 140 S.E. 531 (1927); and *State v. Hunter*, 103 W. Va. 377, 137 S.E. 534 (1927).

In *Noe*, we emphasized the necessity for caution in circumstantial evidence cases.

The record here is long; there were many witnesses. But there is a paucity of relevant, probative evidence.

Ten witnesses testifying to a fact that has little or no probative value, do not by their repetitions make it more important. Here defendant's guilt pends upon proof of a material issue—his identification, or more particularly, his presence at the scene of the crime. An infinite number of witnesses testifying to having seen two black men near the scene at the time of the shooting could not improve the value of this evidence as identification of this particular defendant. And proof of his ownership/ possession of the murder instrument does not carry the State's heavy burden.

The State must prove that a defendant was present at the place and time a crime was committed, if personal presence is essential to proof of the act. *See State v. Pendry,* \_\_\_ W. Va. \_\_\_, 227 S.E.2d 210 (1976); *State v. Withrow,* 142 W. Va. 522, 96 S.E.2d 913 (1957). Evidence that black men (whether bearded or not) were at the scene was not enough. Evidence that a black owned the murder weapon is not enough to put him at the scene.

*State v. Bailey,* 151 W. Va. 796, 155 S.E.2d 850 (1967), provides another construct through which to view this evidence, holding in Syllabus Point One "If, on a trial for murder, the evidence is wholly circumstantial, but as to time, place, motive, means and conduct, it concurs in pointing to the accused as the perpetrator of the crime, he may properly be convicted." When this standard is applied, the State's evidence is again dismally deficient: there was no probative evidence of "time", nor of "place", nor of "conduct"; "motive" is to be inferred from testimony concerning missing money; and "means" was attempted to be proved by the discovery of the murder weapon in a car of which the defendant had non-exclusive possession months after the murder.

Proof of opportunity to commit a crime is not sufficient to establish guilt; the evidence must exclude all reasonable opportunity by others to have committed it. *See* 23 C.J.S. *Criminal Law* § 907 (1961) and cases collected therein.

A review of other jurisdictions reveals not a single case in which such circumstantial evidence has been held sufficient. For example, in *Commonwealth v. Prado*, ___ Pa. ___, 393 A.2d 8, 10 (1978), the supreme court found these facts insufficient to establish a *prima facie* case:

> Appellee did emerge from an alley after the shooting, but no witnesses to the shooting were presented and no evidence of the murder weapon was presented. The prosecution did introduce testimony that the wound was "probably" caused by a high velocity weapon. The only link between this and the appellee is that he once owned such a weapon. The prosecution introduced testimony to establish a motive from an altercation between appellee and ... [victim]; however, such altercation occurred a year prior to the murder. The prosecution introduced remarks made by appellee to a sporting goods salesman that "you didn't sell any bullets to me." ... and, to a detective that "you ain't never going to find my rifle, Turkey," ... and asks us to *infer* that appellee was "conscious of his guilt."

The Court of Criminal Appeals of Texas held more substantial evidence than we have, insufficient in *Flores v. State*, Tex. Crim., 551 S.W.2d 364 (1977). Three "Latin Americans" were seen with the victim in the back seat of his car while he was being issued a speeding ticket. The defendant, a Latin American, was shown to have been in possession of the deceased's car about twenty-four hours later. Six weeks later defendant still had the car, at which time it bore license plates and inspection stickers issued to other cars. Clothing and other items belonging to the victim were found in a suitcase in another car trunk where they had been left by defendant and a companion to be retrieved later. Human blood stains that could not be typed were on the seat of victim's car and on defendant's shirt. An expert testified that the deceased was killed with a gun of the same caliber as one which the deceased owned and had with him (although it was never found).

The court held that because (1) the three Latin Americans observed in the car with the victim were not further identified; (2) the record was silent as to time of death, (although Flores and another were seen with the victim's car, but without the victim in it, the day after the speeding ticket was issued); (3) only an inference could be drawn that the victim was killed with his own gun because it was never found; (4) it was not shown when human bloodstains were made on the victim's car seat and appellant's shirt; and (5) the stains could not be typed, there was therefore "... no showing that the appellant was at or near the scene of the crime and no showing as to actual time of the deceased's death." 551 S.W. 2d at 369. The court concluded that the evidence amounted to a strong suspicion only and did not "... exclude to a moral certainty every other *reasonable* hypothesis except the appellant's guilt." *Id.* at 369.

We conclude that the trial court should have directed a verdict of acquittal due to insufficient evidence at the close of the State's case in chief because the circumstantial evidence presented did not prove guilt to the exclusion of every reasonable hypothesis of innocence, creating only a suspicion of guilt. The judgment is reversed and defendant unconditionally discharged from custody. *Greene v. Massey,* 437 U.S. 19, 57 L.Ed.2d 15, 98 S.Ct. 2151 (1978).

*Reversed.*

NEELY, JUSTICE, *dissenting:*

I respectfully dissent on the grounds that the evidence in this case is sufficiently strong to present a *prima facie* case of guilt. The State proved that the defendant had possession of the murder weapon both *before* and *after* the commission of the murder.

The preeminent authority for holding the evidence here sufficient is the California case of *People v. Tolbert,* 76 Cal. Rptr. 445, 452 P.2d 661, (1969) *cert. denied,* 406 U.S. 971 (1972) where the defendant was convicted of murder based primarily upon his possession of the mur-

der weapon. While in *Tolbert* the defendant lived next door to the victim and was seen in the neighborhood, nonetheless no eye witness placed the defendant at the scene of the crime and his presence on his own front porch near the time of the murder was not inconsistent with innocence. In *Tolbert* the only probative evidence was possession of the murder weapon 6 days after the murder.[1]

The proper standard of review in California is no different from our own; the California court applied it in *Tolbert* by saying:

> The rule on review of the sufficiency of the evidence is that the weight of the evidence is for the jury to determine in the first instance, and the trial court after the verdict in the second instance. If, as in the present case, the circumstances reasonably justify the verdict, an opinion of this court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. 76 Cal. Rptr. at 450, 452 P.2d at 666.

The evidence in the case before us is even stronger than it was in *Tolbert;* here we have definite proof that the defendant had the weapon in his possession both before and after the murder. The record reveals that four witnesses for the prosecution stated that they had seen the defendant with a gun, and three of the witnesses identified the murder weapon as the gun they recalled. While the majority contends that the leading witness for the prosecution, Lloyd Buby, "recanted" his testimony that the defendant had the weapon before the murder, upon

---

[1]Similarly, in *Robinson v. State*, 18 Md. App. 678, 308 A.2d 734 (1973), the only probative evidence was possession of the murder weapon before and after the murder, hairs found on the victim that were the same color as the defendant's, unexplained blood stains on the shoes and jacket of the defendant, and ownership of a vehicle which emitted large quantities of carbon similar to the quantity and composition of the carbon found at the murder scene.

closer examination the testimony demonstrates that the witness only qualified his identification to the extent that he said that the gun admitted into evidence had more rust on it than the weapon he remembered seeing in the defendant's possession. His testimony was still that he had observed that the defendant had an uncommon looking gun before the murder which looked like the murder weapon presented at trial. The witness, who lived and worked with the defendant for a while, testified that on one occasion he stole the pistol in question because he feared the defendant might use it against him. His testimony demonstrates that he had ample opportunity to study and to become familiar with the weapon while it was in his possession.[2]

---

[2]The record states:

Q. Did you go into the house ... your apartment?

A. Yeah, I went in and got a coat.

Q. What else then did you at that time take from the house?

A. The gun over the vent and my jacket.

Q. Where, if anyplace, then did you go after you had taken the gun and your jacket?

A. I went through the woods way to Dean Goodnight's house on Cleveland Avenue.

Q. What was the purpose of your going to Dean Goodnight's place?

A. To get some shells for the gun.

Q. What type shells were you at that time looking for?

A. .38s.

Q. Did Dean Goodnight have any .38 ammunition?

A. No.

Q. Did you at that time have an opportunity to observe the gun more closely then?

A. Yeah, I held it around and clicked it open and looked at it.

Q. Was it a .38 cal? Would you describe it the best you can now for us, please after you then saw it?

A. It was chrome or liquid plated and it had a black handle and was five shot and it dropped down like a shotgun.

Q. In other words, the cylinder popped open when you loaded it? By looking at the Cylinder you saw five holes and you could load it?

A. Yes.

Q. How long did you keep the gun?

A. Around two hours.

Q. Then what happened? Did you see Joe Dobbs later?

A. Yes.

The murder weapon itself was not a commonplace, everyday 38 caliber pistol. Lloyd Buby testified that he had seen other .38s but he had never seen one exactly like the murder weapon. This particular .38 had several distinctive features: chrome or liquid plating, a black handle, and a loading mechanism similar to that used

---

Q. Where did you first see him after that?
A. I was at Dean Goodnight's house and he came there.
Q. And what was his purpose of being there at that time?
A. He was looking for me.
Q. What, if anything, did he ask you for? Did you talk with him?
A. Yes.
Q. What did Joe want?
A. Just wanted me.
Q. What did he want you for at that time?
A. I guess just to talk to me.
Q. How about in reference to the gun, did you have conversation about that?
A. After we got in the car.
Q. What, if anything, was your conversation with respect to the gun?
A. He said, did you steal my gun?
Q. Meaning the .38?
A. Yes.
Q. What did you do in reply to his question?
A. I said what gun.
Q. Then what?
A. He said, the gun over the vent.
Q. Then what did you respond and what did you do with the gun?
A. I pulled it out of my coat pocket and handed it to him.
Q. Did you then give him the gun?
A. Yeah.
Q. Did he take it?
A. Yeah.
Q. Did you then continue to see Joe at any time after you gave him the gun?
A. Well, we drove around that night.
Q. Did you at any time after that take the gun back?
A. No.
Q. Do you know what, if anything, happened to the gun after you gave it to Joe?
A. No.
Q. Did you ever make any observation as to how Joe maintained the gun or what he kept it in and that sort of thing while you were staying there at the apartment and that sort of thing?
A. It was wrapped in a rag over the vent as far as I know.

for a shotgun, in that it split apart. All of these factors combined to make this a memorable weapon, not just a typical .38 caliber pistol. Once the ownership of the pistol *before* and *after* the murder had been proven, the State had established a *prima facie* case.

---

Q. Let me show you what has been marked as State's Exhibit Number 18 and in talking of the gun you made mention to, how do you compare this item with the one that you had seen at that time? (Handing gun to witness)

A. This is it.

Q. You say that is it?

A. Yes.

MR. MASCARA: No further questions.

CROSS EXAMINATION BY MR. CLECKLEY

Q. Mr. Buby, where are you living now?

A. Forestry Camp at Davis.

Q. You are convicted of a crime, is that right?

A. Yes.

Q. What crime is that?

A. Breaking and entering.

Q. How about ... have you ever been charged or convicted with the larceny of a vehicle?

A. No, the charges were dropped as far as I know.

Q. The charges were dropped of a vehicle. Whose vehicle was that?

A. There was in two cases, one was a '57 Chevy. There was another one that belonged to Joe Dobbs.

Q. As I understand it, when was the last day you had seen the gun?

A. It was sometime near the middle of August.

A. Yes. (By nod of head)

Q. How long have you been in Forestry Camp?

A. Six months and a half.

Q. That would be about December, is that right when you went?

A. No, I went in November.

Q. And would this be since the middle of August would today be the first time you have seen that gun since then? Between the middle of August and today, is this the first time you have seen the gun?

A. Yeah.

Q. You indicated after looking at it saying that this is it. Please, with as much particularity as you can in due time, how do you draw the conclusion that this is the gun.

A. It looks just about like the gun I seen.

Q. It looks about like it?

A. Except for the rust on it.

We must concede at the outset that any time a conviction is procured on circumstantial evidence there is a possibility of error. Some circumstantial evidence is stronger than other circumstantial evidence; nonetheless, a conviction is seldom procured on evidence sufficiently strong to be beyond all possibility of error. Con-

---

Q. The gun that you had seen didn't have any rust on it?

A. Right.

Q. Other than this particular gun that you claim you saw there, were there any other guns in this apartment?

A. No.

Q. What caused you to take the gun?

A. I was afraid of Dobbs.

Q. You took it for protection, I guess?

A. Yes.

Q. And you kept it for about two hours?

A. Yeah.

Q. When he came along to get the gun back, where were you again?

A. At Dean Goodnight's house.

Q. And that is where he found you?

A. Yes.

Q. As I understand it, this was in the middle of August too, wasn't it?

A. Whenever I had the gun?

Q. Yes.

A. No, this was some time near the middle of July maybe the end of July.

Q. The middle of July or about the end of July?

A. Yes. (by nod of head)

Q. How long had the gun been over the vent that you were talking about?

A. I couldn't say for sure. It was a week or so since when I noticed it and took it.

Q. Have you ever seen a .38 gun like that before?

A. Not exactly like that one.

Q. Have you seen other .38s?

A. Yes.

Q. Where have you seen these?

A. A friend of mine had one in Barrackville.

Q. That's the only one you've seen. Have you seen others other than the one your friend had?

A. A western pistol my cousin has.

Q. That wasn't a .38 though or was it a .38?

A. A western, yes, .38.

Q. Let me make sure I understand it. You had first seen the gun that Joe Dobbs had in his possession. It wasn't in the apartment at

sequently, a reviewing court must make some subjective determination of the actual probability of error first, and then proceed to work backward from its conclusion about probabilities to the application of some general rule about sufficiency. This determination is inherently a subjective process; regardless of what we say to the contrary, an appellate court will always reverse where it strongly disagrees with the conclusion of the jury regardless of the technique it selects to disguise this simple process. *See,* for example, *Cannellas v. McKenzie,* ____ W. Va. ____, 236 S.E.2d 327 (1977).

There are thousands of random results throughout the American jurisdictions which attempt to apply the simple standard of review quoted above from the California court in *Tolbert, supra* with little attempt to illuminate the reasoning process by which courts conclude that certain evidence satisfies the rule while other evidence does not. What circumstantial evidence excludes all reasonable hypotheses of innocence? I suspect that there is such a paucity of illumination on the subject because an honest analysis brings a reviewing court squarely into an apparent conflict with *Griffin v. California,* 380 U.S. 609 (1965) which holds that no unfavorable inference may be drawn from the defendant's failure to testify. Nonetheless, it is possible to explain how courts have applied the sufficiency standard only with reference to the ease or difficulty which the defendant would have in rebutting the circumstantial evidence against him. The

---

this time, but you had seen it before, that is before the gun was placed in the vent in the apartment, is that right?

A. Yes, but it was in the apartment when I seen it.

Q. Where was that?

A. This was in my bedroom.

Q. Who else was present at this time?

A. Me and Joe Dobbs.

Q. Were you the only two there?

A. Yes.

MR. CLECKLEY: No further questions of this witness. I would like to recall him for my case.

MR. MASCARA: No questions.

Whereupon, the witness was excused.

whole rationale for appellate review of sufficiency is to foreclose defendants from becoming victims of circumstances in a very literal sense. Why should defendants who have the peculiar ability to rebut apparently *prima facie* cases with evidence which is within their own knowledge be accorded the same reluctance to convict as those who are totally at the mercy of the sufficiency test?

Where circumstantial evidence is incapable of being rebutted by the defendant courts should apply a significantly higher standard for determining sufficiency than in cases where the defendant can easily rebut the circumstantial evidence. In the case before us only the defendant knew the history of his weapon; if it were not in his possession at the time of the murder then he and he alone had the capacity to demonstrate its whereabouts.

Even while paying sincere deference to the holding of *Griffin v. California, supra,* that neither comment by prosecution nor instructions to the jury may permit the inference that the silence of the accused is evidence of guilt, it is not inconsistent or illogical to recognize a certain elasticity in the standard for evaluating sufficiency of evidence based exclusively upon a high resolve to assure that no innocent defendant be unjustly convicted. If the gun had been found in the possession of the defendant twenty minutes after the robbery would that have been sufficient? One day? One week? What if in addition to the murder weapon the police had discovered clothes in the possession of the defendant which were similar to those worn by the assailant? If it is agreed that a conviction could be had in any of these hypothetical examples, it must then be conceded that sufficiency is basically predicated upon probabilities and is not absolute. Even in a case where the defendant had the gun and similar clothes twenty minutes after the murder there would not be proof beyond all possibility of mistake. The very recognition of a standard of review based on probabilities leads ineluctably to a recognition of the legitimacy of elasticity in that standard. Appel-

late court relief for insufficiency should be predicated upon the ease or difficulty which the defendant would have in rebutting the circumstantial evidence against him.

Where, for example, a defendant is convicted upon evidence which shows that he was driving a motor vehicle similar to the one in which an assailant fled, was wearing clothes similar to those worn by the assailant, and was close to the scene of the crime within a few hours of its perpetration, the standard should be higher than in the case before us because all of the evidence in our hypothetical example is consistent with innocence and there is absolutely *no evidence* other than alibi which the defendant can produce to rebut the inferences to be drawn from his unlucky circumstances. Absent an alibi the defendant may be a victim and there is nothing which he could reasonably be expected to know which would exonerate him or cast any light on the real perpetrator. In the case before us, however, the defendant knows everything; he and he alone can explain where his weapon was, whether it was lost, whether it was stolen, how he came to repossess it, and possibly who the real perpetrator is.

The majority is wrong to gainsay the conclusions of the trial judge and jury in this case. The unexplained possession of a murder weapon both *before* and after the murder is sufficient circumstantial evidence to make out a *prima facie* case. The use of the term "unexplained" possession does not magically invoke the spectre of *Griffin* because at some point the evidence will be so compelling that the defendant *must* take the stand. Would the defendant need to take the stand if he had been caught with the weapon five minutes after the murder? What constitutes a *prima facie* case is always a subjective determination so that regardless of the threshold of sufficiency for a particular judge, the *unexplained* existence of certain circumstances when that particular threshold is met will cause the defendant to take the stand or suffer a conviction. Our fear of appearing cava-

lier about the rights of defendants to require the State to prove its case leads courts universally to eschew any analysis of the ease or difficulty with which a defendant can rebut circumstantial evidence lest we run afoul of *Griffin, supra,* yet this unarticulated consideration must lurk in the dark recesses of every judge's mind. The difficulty with unarticulated criteria is that they ultimately cloud the thinking process. While appellate judges may know the distinction between what they do and what they say they do, trial judges cannot be expected to be mind readers.

The *results* of most cases on sufficiency stand for the proposition that defendants are entitled to more protection in the form of appellate review of sufficiency when circumstances are beyond their power of explanation than when the incriminating circumstances can be easily explained. To accept any other view will either lead to inadequate protection for those unlucky enough to be victims of circumstances by reciting a mechanical rule which leaves everything to the discretion of the jury as long as there is "some evidence" or, alternatively, will lead to the freeing of the obviously guilty because we are unwilling to exercise our minds to a sufficient extent to reconcile the defendant's right to remain silent with the related problem of a proper standard for appellate review of sufficiency which takes account of *relative* degrees of likelihood of erroneous convictions dependent on the nature of the circumstantial evidence.

In this regard it would appear that the mere possession of a murder weapon two and a half months *after* the murder, i.e. November *4*, 197*4* to January *27*, 197*5* would not constitute a *prima facie* case because it could not logically be concluded that the defendant would have it in his power to rebut the evidence to show where the gun was before he bought it; however, possession both *before* and *after* the murder would lead reasonable minds to conclude that if it were not the defendant's gun and the defendant had not used it to commit the murder, the likelihood of an erroneous conviction would

be very small as the defendant had it exclusively in his power to show the jury where the gun was at the time of the crime. Like all other circumstantial evidence ownership and possession of a murder weapon before and after the murder does not exclude all hypotheses of innocence, but the jury were entitled to conclude that it excluded all *reasonable* hypotheses of innocence. That, of course, is the proper standard. *State v. Knotts*, 156 W. Va. 748, 197 S.E.2d 93 (1973).

