IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2014 Term

_____

No. 12-1389

_____

**FILED**

**June 5, 2014**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

ANTONIO PROPHET,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Berkeley County
The Honorable Christopher C. Wilkes, Judge
Criminal Action No. 11-F-67

AFFIRMED

_____

Submitted: April 7, 2014
Filed: June 5, 2014

Christopher J. Prezioso, Esq.                Cheryl K. Saville, Esq.
Luttrell & Prezioso, PLLC                    Assistant Prosecuting Attorney
Charles Town, West Virginia                  Martinsburg, West Virginia
Counsel for the Petitioner                   Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1.      "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

2.      "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

3.  "The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice." Syl. pt. 4, *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956).

4.  "Under the Due Process Clause of the *West Virginia Constitution*, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury." Syl. pt. 1, *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977).

5.  As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996).

6.  "A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction

ii

cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion." Syl. pt. 4, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

7. "There should be only one standard of proof in criminal cases and that is proof beyond a reasonable doubt. Once a proper instruction is given advising the jury as to the State's heavy burden under the guilt beyond a reasonable doubt standard, an additional instruction on circumstantial evidence is no longer required even if the State relies wholly on circumstantial evidence." Syl. pt. 2, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

8. "In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict." Syl. pt. 2, *State ex rel. Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009).

9. "Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to

which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." Syl. pt. 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

10.   "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

Per Curiam:

Petitioner Antonio Prophet appeals his convictions in the Circuit Court of Berkeley County of two counts of first-degree murder, both without a recommendation of mercy, and one count of arson. For the reasons set forth below, we affirm the petitioner's convictions.

## I. FACTS

A summary of the facts that are relevant to the petitioner's assignments of error is as follows. One of the victims in this case, Angela Devonshire, 22 years of age, was the girlfriend of the petitioner. There was testimony that Angela was addicted to heroin and was scheduled to enter a rehabilitation facility. Angela lived in a garage apartment in Berkeley County with her two children: Andre, the other victim, who was three years of age, and Daronte, who was six weeks in age. The garage apartment was located at the end of Angela's parents' driveway about 75 yards from her parents' house.

On the evening of June 5, 2010, the petitioner arrived at Angela's apartment to spend the night with her and her two sons. Sidney Devonshire III, Angela's brother, testified that he saw the petitioner and Angela together in Angela's apartment at about 9:00 that night. Elizabeth Kay Devonshire, Angela's mother, testified that she awoke at 3:00 a.m., on June 6th and looked out the window toward her daughter's

1

apartment. She testified that everything was quiet and that she noticed that her daughter's curtains were pulled tight.

A passing motorist saw that Angela's apartment was on fire at 4:36 a.m. on June 6th and called 911. A fire marshal testified at trial that the fire was incendiary in nature and originated in the middle of the living room floor of the apartment. Angela's and Andre's bodies were found in the burned apartment. While Andre's body was too badly burned to determine a cause of death, the medical examiner determined that Angela's throat was slit and that she died prior to the fire. The infant, Daronte, was found alive on Ms. Angela's parents' patio in blood-spattered clothing. The blood on the baby's clothing was later determined by an expert to be the petitioner's. After the fire, the petitioner fled to North Carolina where he was eventually arrested. At the time of his arrest, the petitioner had injuries on his hands which were defensive in nature.

The State presented several witnesses regarding the petitioner's specific movements on the morning of June 6th after he fled Angela's burning apartment. Among these witnesses was Heather Aronhalt, a cashier at a convenience store, who testified that she saw the petitioner enter the store at 7 a.m. on June 6th, and that the petitioner had a cut on his neck and blood on his neck and shirt. According to Ms. Aronhalt, the petitioner appeared disturbed and distraught, and he was sweating.

Katie Draughon, the petitioner's ex-girlfriend who lived in Manassas, Virginia, testified that the petitioner contacted her on the morning of June 6th and indicated that he was stranded in Berkeley County, West Virginia. Ms. Draughon testified that she employed John Willingham, a taxi driver in Berkeley County, to transport the petitioner to Virginia. According to Ms. Draughon, she met briefly with the petitioner in Virginia and supplied him with clothes, a working cell phone, and a twenty-dollar bill. Ms. Draughon further testified that she drove the petitioner to the train station in Winchester, Virginia.

Anica Small, who was with Joseph Medina on the night of June 5th and the morning of June 6th, testified that Mr. Medina received a text message from the petitioner around 4:30 a.m. on June 6th saying that the petitioner "was in a situation and he needs [Mr. Medina's] help." Joseph Medina testified that he and the petitioner had been friends since grade school. Mr. Medina, a drug dealer, testified that the petitioner texted him early in the morning of June 6th that he was in a situation and needed help. Mr. Medina testified that he initially ignored the messages but did call the petitioner later that day. According to Mr. Medina, the petitioner informed him that Angela had been going through his pockets and "stuff happened."

The petitioner testified on his own behalf. He indicated that he came to Martinsburg, West Virginia, at the behest of Joseph Medina, arriving in May 2010. At that time, Mr. Medina was staying with a woman named Shannon. In mid-May, the

3

petitioner met Angela at Shannon's house when Angela came there to purchase drugs from Mr. Medina. Thereafter, a relationship developed between the petitioner and Angela. Prior to June 5, 2010, the petitioner had visited her apartment eight or nine times and had spent the night there on five or six occasions.

According to the petitioner, on June 3rd, Mr. Medina stole the laptop of a woman named Chareese Davis and gave it to the petitioner to hold. Mr. Medina indicated to the petitioner that he intended to extort money from Ms. Davis in exchange for the return of her computer. The petitioner became angry at Mr. Medina for involving him in this scheme and a heated argument ensued between the petitioner and Mr. Medina. During this argument, Mr. Medina threatened to harm the petitioner, Angela, and Angela's family. Shortly after this argument, the petitioner placed the laptop in some weeds with the expectation that Mr. Medina would retrieve it.

The petitioner further testified that he called 911 anonymously to report Mr. Medina's threats. He was directed by the 911 operator to call the Martinsburg Police Department which directed him to call the Berkeley County Sheriff's Department. The petitioner's testimony that he called 911 was supported by his cell phone records and other documentation.

Regarding the events of the evening of June 5th and the morning of June 6th at Angela's apartment, the petitioner testified that on June 5th, Mr. Medina called him

4

to wish him a happy birthday, but the petitioner perceived this call to be a subterfuge by Mr. Medina for the purpose of determining the petitioner's whereabouts. At 12:30 a.m., on June 6th, Angela awakened the petitioner, stating there were two guys at the door who would not leave. One of them was named "Boogy" and the other was unknown, but wore a Baltimore Orioles ball cap. When the petitioner went to the door to confront the men, they said they were looking for Angela, explaining that Angela was a junkie who owed them money. The petitioner convinced the two men to leave but they promised to return. When the petitioner questioned Angela about this matter, she denied owing money to the men.

The petitioner further testified that sometime later he and Angela went outside to smoke cigarettes on the porch of the garage apartment. At that point, Boogy jumped out and charged up the steps toward the petitioner and Angela. Angela ran back into the house, leaving the petitioner to fend off the attackers. The petitioner then tried to run into the house and shut the door, but Boogy crashed into the apartment where he and the petitioner continued to fight.

According to the petitioner, the Baltimore Orioles-capped man then appeared, holding a gun. Boogy, with whom the petitioner was fighting, had a knife and cut the petitioner's inner forearm as well as his pinky finger. After this struggle, the petitioner was directed to sit on the couch. He saw Boogy screaming at Angela about money. Boogy then attempted to cut Angela's throat with the same knife used to cut the petitioner. The petitioner attempted to grab the knife at which point the Baltimore

5

Orioles-capped man struck the petitioner with the gun, and Boogy then cut the petitioner's hand with the knife.

The petitioner testified that Boogy took him downstairs for the purpose of breaking into the garage to steal something. After the petitioner arrived back upstairs in the apartment, he saw Angela lying on a mattress with her throat slit and the three-year-old Andre lying beside her in a pool of blood. At this point the petitioner sprayed the gun-wielding Baltimore Orioles-capped man with mace and fled the apartment. As he ran through the woods, shots were fired at him and he heard the voice of a third man whom he thought may have been Mr. Medina. The petitioner, upon seeing smoke coming from the apartment, ran back into the apartment, grabbed six-week-old Daronte, and placed him on Angela's parents' patio. He banged on the Devonshires' door and when nobody answered, he panicked and fled. The petitioner admitted that he did not call emergency services and told no one about the events surrounding the victims' deaths and the fire until he testified in court.

The prosecutor vigorously cross-examined the petitioner at length. Of particular relevance in this case is the fact that the prosecutor was permitted to question the petitioner about a novel that he wrote several years earlier titled *Enter the Fire: Seven Days in the Life*. In a prior stipulation, the parties had agreed that the State could not use the novel in the State's opening statement or its case-in-chief but that the State would be free, subject to the rules of evidence, to refer to the novel in any rebuttal that it might

present. When the prosecutor began questioning the petitioner regarding the novel, the petitioner's counsel objected on the basis of the stipulation and relevancy. The circuit court determined that the stipulation did not prevent the novel's use during cross-examination of the petitioner and further, that the novel was relevant to the petitioner's credibility. Specifically, the circuit court reasoned as follows:

> Well, I think the biggest relevance is here we're going to credibility. Once you put your client on the stand it goes to credibility. The State's theory is this is all made up, his whole story is made up. If they can show he's previously written a book that involves drugs and somebody being killed and things like that I think they're entitled to explore into that. It's not fair to say we had to put our client on the stand and say this and not to say the State is entitled to say wait a minute, he has written about this stuff before, just pigeon holed into it.

During her cross-examination of the petitioner, the prosecutor was able to establish that the petitioner's novel contains themes of violence within the drug culture, the novel refers to a house fire; two main characters in the novel were drug dealers, the wife of one of the main characters is killed and his young child is seriously injured in a home invasion, and a character in the novel has his throat slit. The prosecutor, in her closing argument, characterized the petitioner as a writer of crime fiction who had two years to parse every piece of the State's evidence in his case and to fabricate a story consistent with the State's evidence. The prosecutor also emphasized the similarities between the petitioner's novel and his trial testimony.

7

The jury convicted the petitioner of two counts of first-degree murder for the killings of Angela and Andre, without a recommendation of mercy, and arson for starting the fire that burned Angela's apartment.

The petitioner's post-trial motions for acquittal and for a new trial were denied by the circuit court, and the court sentenced the petitioner to life in the penitentiary without the possibility of parole for each of the first-degree murder convictions and a determinate term of twenty years for the arson conviction, with the sentences to run consecutively. The petitioner now appeals the circuit court's denial of his post-trial motions.

## II. STANDARD OF REVIEW

Generally,

> [i]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000). Other relevant standards of review will be set forth in the discussion of each assignment of error.

8

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

In his first assignment of error, the petitioner contends that the evidence was insufficient to support his convictions. The petitioner asserts in his brief that there was insufficient evidence to convict him of murder and arson because the State presented evidence only of opportunity and flight which, says the petitioner, is insufficient to prove the alleged crimes.

Our standard of reviewing a claim of insufficient evidence to support a conviction is found in syllabus point 1 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995):

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Further:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt

9

beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

Syl. pt. 3, *Id.*

This Court's reading of the trial transcript indicates that at the close of the State's case-in-chief, the petitioner moved for judgment of acquittal on the first-degree murder charges on the basis that there was insufficient evidence of premeditation and deliberation. The petitioner conceded, however, that there was sufficient evidence to support a finding of second-degree murder.[1] At the close of the petitioner's evidence, the petitioner simply renewed his motion for a judgment of acquittal and his argument in support thereof without making further argument. In light of the specific grounds for the petitioner's motion for judgment of acquittal, this Court will confine our inquiry to

---

[1] With regard to second-degree murder, the petitioner opined during his argument for judgment of acquittal as follows:

> Second-degree murder. You could – I know you could infer – I hate to argue that way but I will. I understand. You can infer malice in the use of an instrument. We think it is a knife. We don't know. Certainly the medical examiner testified it was some sharp implement. I'm with you. Okay. But premeditation and deliberation? Just don't see it.

whether the State presented sufficient evidence to prove the elements of premeditation and deliberation.[2]

The petitioner was convicted of first-degree murder pursuant to W. Va. Code § 61-2-1 (1991), which provides in relevant part that "[m]urder by . . . any willful, deliberate and premeditated killing . . . is murder of the first degree." This Court has defined first-degree murder as "an unlawful killing of another human being with malice, premeditation, and deliberation." *State v. Browning*, 199 W. Va. 417, 420, 485 S.E.2d 1, 4 (1997) (citation omitted). "Under West Virginia law, the terms 'deliberate' and 'premeditate' are synonymous." *State v. Miller*, 197 W. Va. 588, 600, 476 S.E.2d 535, 547 (1996). With regard to the element of premeditation, we have indicated that "[a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design." *Guthrie*, 194 W. at 675, 461 S.E.2d at 181. This Court also has recognized that "[a]s a practical matter, premeditation generally can be proved only by circumstantial evidence." *State v. LaRock*, 196 W. Va. 294, 305, 470 S.E.2d 613, 624 (1996). Direct proof of premeditation is "seldom possible" due to the reality that a "defendant's mental processes are wholly subjective." *Id.* Finally, this Court explained in *LaRock*:

---

[2] This Court has held that "[w]hen a party relies in the trial court upon a specific ground for relief or in defense, he is bound thereby, and will ordinarily be refused relief in the appellate court on any position inconsistent therewith." Syl. pt. 3, *Bush v. Ralphsnyder*, 100 W. Va. 464, 130 S.E. 807 (1925).

11

> If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

*Id.*

Upon applying our law on premeditation to the evidence presented at the petitioner's trial, we find sufficient evidence for a jury to find premeditation. The evidence indicates that the petitioner was with Angela in her apartment from the night of June 5th, 2010, until the victims' deaths and the apartment fire in the early morning hours of June 6th. A rational trier of fact could conclude that this was sufficient time for the petitioner to form the intent to kill the victims and to deliberate on the matter before he actually killed them. Also, from Elizabeth Devonshire's testimony that at 3:00 a.m. on June 6 she noticed that the curtains in the window of her daughter's apartment were pulled so tight that no light escaped from them, a reasonable person could infer that the petitioner pulled the curtains tight so that no one would witness him kill the victims and that this showed deliberation. Moreover, a jury could infer that the petitioner reported Mr. Medina's alleged threat against the victims on June 3rd in order to frame Mr. Medina for the victims' killings which the petitioner already had planned. Indeed, despite the petitioner's testimony that he thought he heard Mr. Medina's voice at the crime site, both Mr. Medina and Ms. Small testified that Mr. Medina was elsewhere and that petitioner texted Mr. Medina that he was "in a situation" and that he needed help. We believe that a jury could reasonably conclude from this testimony that petitioner's testimony was not

12

credible. Moreover, we observe that Mr. Medina testified that petitioner later told him that petitioner had caught Angela "going through his pockets." A jury could have reasonably viewed such testimony as providing the motive which caused petitioner to determine to kill Angela. Finally, there are not one, but two killings here. A reasonable person could infer that after killing Angela, the petitioner killed Andre because the petitioner knew that Andre, but not infant Daronte, could identify him, which is evidence of premeditation. Therefore, we conclude that the record contains substantial evidence from which a jury could find the elements of premeditation and deliberation beyond a reasonable doubt.[3]

## B. Cross-Examination of Petitioner Regarding His Novel

Second, the petitioner asserts that permitting the State to cross examine him with regard to the work of fiction that he wrote several years earlier titled *Enter the Fire: Seven Days in the Life* resulted in undue prejudice. The petitioner asserted below, and now argues before this Court, that the prosecutor's cross-examination of the petitioner regarding his novel is not relevant to any issue in the petitioner's trial.

This Court has held:

---

[3] In support of his motion of judgment of acquittal below, the petitioner also made a cursory argument that there was insufficient evidence to support the charge of arson. However, in his brief the petitioner does not set forth a separate argument of insufficiency of the evidence as to the arson charge. As a result, this Court declines to address the issue of sufficiency of evidence of arson. *See* syllabus point 6, *Addair v. Bryant*, 168 W. Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived.").

13

The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice.

Syl. pt. 4, *State v. Carduff*, 142 W. Va. 18, 93 S.E.2d 502 (1956). Consequently, the issue before us is whether the circuit court's decision to permit the State to cross-examine the petitioner on his novel resulted in manifest abuse or injustice.

The scope of cross-examination of a party is governed by Rule 611(b)(1) of the *West Virginia Rules of Evidence* which provides that "[a] party may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interest of justice, the judge may limit cross-examination with respect to matters not testified to on direct examination." We previously have explained regarding application of this rule:

In applying Rule 611(b) of the West Virginia Rules of Evidence, the circuit court has considerable discretion to determine the proper scope of cross-examination, after weighing such factors as the importance of the evidence to the prosecution's case, the relevance of the conduct to the witness's truthfulness, and the danger of prejudice, confusion, or delay raised by the evidence sought to be adduced. It is a well settled rule that a defendant who voluntarily offers himself as a witness and testifies in his own behalf subjects himself to legitimate and pertinent cross-examination to test his veracity and credibility. Thus, by deciding to testify in a West Virginia criminal trial, a defendant brings into play the rules designed to implement the truth-finding process, i.e., cross-examination.

14

*State v. Bradshaw*, 193 W. Va. 519, 540-41, 457 S.E.2d 456, 477-78 (1995) (footnotes omitted). Moreover, we have recognized that Rule 611(b)(1) "by its very terms encourages wide-open cross-examination when a party is a witness unless the defendant can demonstrate that literal application of the rule would create an unjust situation." *Bradshaw*, 193 W. Va. at 541 n.30, 457 S.E.2d at 478 n.30.

This Court finds that the circuit court's decision to permit the prosecutor to cross-examine the petitioner regarding his novel did not result in manifest abuse and injustice, nor did it result in undue prejudice to the petitioner. The petitioner, by testifying, placed his credibility at issue. The prosecutor's use of the novel is relevant to the petitioner's credibility. Specifically, the prosecutor used the fact that the petitioner was a creative writer to imply that he used his creative skills to fabricate his trial testimony and that he borrowed several elements from his novel in fabricating his trial testimony. Moreover, we believe that the prosecutor's use of the novel to challenge the petitioner's credibility outweighed any danger of prejudice, confusion, or delay. We do not believe that the prosecutor used the novel to suggest that the fact that the petitioner wrote a novel about violence in the drug culture made it more likely that he killed the victims.

The petitioner presents several arguments against the cross-examination at issue all of which lack merit. The petitioner asserts that the cross-examination was outside the scope of direct examination. However, Rule 611(b)(1) does not mandate that

cross-examination of a party must be limited to the subject matter of the direct examination. Instead, the rule states that a judge *may* limit cross-examination with respect to matters not testified to on direct examination. Also, the cross-examination at issue did not constitute improper character evidence under Rule of Evidence 404, and it did not involve the improper admission of a specific instance of conduct bearing on the truthfulness or untruthfulness of the accused under Rule of Evidence 608(b). Therefore, we find that the circuit court did not abuse its discretion in permitting the cross-examination complained of by the petitioner.

### C. Prosecutor's Comment on Post-Arrest Silence

In his third assignment of error, the petitioner contends that the circuit court erred in permitting the State to use the petitioner's post-arrest silence to impeach him.

This Court has held:

> Under the Due Process Clause of the *West Virginia Constitution*, Article III, Section 10, and the presumption of innocence embodied therein, and Article III, Section 5, relating to the right against self-incrimination, it is reversible error for the prosecutor to cross-examine a defendant in regard to his pre-trial silence or to comment on the same to the jury.

Syl. pt. 1, *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977). However, comments on pre-arrest silence are distinguished from comments on post-arrest silence. *See State v. Walker*, 207 W. Va. 415, 419 n.2, 533 S.E.2d 48, 52 n.2 (2000) (stating that "the protections afforded a defendant for post-*Miranda* silence are generally not available for

16

pre-arrest silence. This Court noted approvingly in [*State v.*] *Oxier*, 175 W. Va. [760] at 761 n. 1, 338 S.E.2d [360] at 361 n. 1 [1985], language from the decision in *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S.Ct. 2124, 2130, 65 L.Ed.2d 86, 96 (1980), that 'impeachment by use of prearrest silence does not violate the Fourteenth Amendment.'").

During the prosecutor's cross-examination of the petitioner, she asked the petitioner the following question:

> Q. And you told us today that you wrote this work of fiction and you've told us this story that you've told us about what happened on the night of the events and that particular story was never told to anyone of law enforcement –

At that point, petitioner's counsel objected, and the lawyers had a discussion with the court regarding the matter. The circuit court then instructed the prosecutor that she could inquire of the petitioner regarding pre-arrest silence but not post-arrest silence. The prosecutor then resumed her cross-examination as follows:

> Q. You did not tell anyone the story that you told us yesterday prior to taking the stand; is that correct?
>
> A. That's incorrect.
>
> [Petitioner's counsel]: Objection. Move to strike based on the ruling. Unless I totally misunderstood what the Court –
>
> The Court: Well, no. What I said – I'm going to allow that and leave it at that. I will overrule the objection based on that.
>
> Q. Did you, in fact, contact Sidney Devonshire –

The prosecutor then established by questioning the petitioner that the petitioner contacted Mr. Devonshire, the father of Angela and grandfather of Andre, after the murders but that

17

the petitioner never related to Mr. Devonshire the version of events surrounding the murders that he testified to in court.

We find that the prosecutor did not improperly cross-examine the petitioner regarding his post-arrest silence. The first question set forth was general and did not specifically refer to post-arrest silence, and it was brief and isolated. While the prosecutor's second question above potentially could have been construed as referring to the petitioner's post-arrest silence, it also could simply have been a general initial question for the prosecutor's line of questioning regarding petitioner's pre-arrest discussion with Mr. Devonshire. The question was ambiguous and isolated, and the prosecutor did not pursue this question improperly into the realm of post-arrest silence. Instead, after the petitioner's counsel objected to the question, the prosecutor asked the petitioner about is failure to tell Mr. Devonshire the version of events the petitioner testified to in court. As a result, we find that the prosecutor did not improperly cross-examine the petitioner concerning his post-arrest silence.

## D. Proffered Instruction

In his next assignment of error, the petitioner avers that the circuit court erred in rejecting his proffered instruction from *State v. Dobbs*, 163 W. Va. 630, 635, 259 S.E.2d 829, 832 (1979), which says that "[p]roof of opportunity to commit a crime is not sufficient to establish guilt; the evidence must exclude all reasonable opportunity by others to have committed it." (Citations omitted).

18

We are mindful that "[a]s a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo*." Syl. pt. 1, *State v. Hinkle*, 200 W. Va. 280, 489 S.E.2d 257 (1996). Moreover, in reviewing a circuit court's decision to deny or give jury instructions proffered by a party, this Court has held:

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Syl. pt. 4, *Guthrie*, 194 W. Va. 657, 461 S.E.2d 163.

This Court finds that the circuit court's refusal to give the instruction from *Dobbs* is not error because this language is no longer a correct statement of the law. The statement relied on by the petitioner appears in the body of the *Dobbs* opinion and is also included in syllabus point 2 of *Dobbs* which states:

> Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction.

In *Dobbs*, this Court reasoned that circumstantial evidence was insufficient to support a conviction unless the State also excluded every reasonable hypothesis of innocence including every reasonably opportunity by someone other than the defendant to have committed the crime. However, syllabus point 2 of *Dobbs* was overruled by syllabus point 2 of *Guthrie*, 194 W. Va. 657, 461 S.E.2d 163, in which this Court held:

> There should be only one standard of proof in criminal cases and that is proof beyond a reasonable doubt. Once a proper instruction is given advising the jury as to the State's heavy burden under the guilt beyond a reasonable doubt standard, an additional instruction on circumstantial evidence is no longer required even if the State relies wholly on circumstantial evidence.

In addition, "[t]he evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt." Syl. pt. 3, in part, *Guthrie*. Applying this law to the instant facts, we find that the circuit court properly instructed the jury that the standard of proof in criminal cases is proof beyond a reasonable doubt. Having done so, the giving of an additional instruction on circumstantial evidence and the reasonable opportunity of someone other than the defendant to commit the crime was not required. Consequently, we find no merit to this assignment of error.

### E.  State's Alleged Presentation of Perjured Testimony

The petitioner further alleges that his conviction should be reversed because the petitioner knowingly allowed Joseph Medina to present false and perjured testimony.

The petitioner asserts that the prosecutor should have known that Mr. Medina's testimony was false because he testified to things at trial that he omitted in earlier discussions with law enforcement, he had a motive to lie at trial, he testified to things that were inconsistent with other evidence presented, his testimony was completely impeached on cross-examination, and he had a history of committing crimes and other bad acts.

This issue is governed by syllabus point 2 of *Franklin v. McBride*, 226 W. Va. 375, 701 S.E.2d 97 (2009), in which this Court held:

> In order to obtain a new trial on a claim that the prosecutor presented false testimony at trial, a defendant must demonstrate that (1) the prosecutor presented false testimony, (2) the prosecutor knew or should have known the testimony was false, and (3) the false testimony had a material effect on the jury verdict.

We find that the petitioner has failed to show that the prosecutor presented false testimony. First, there is no conclusive evidence that Mr. Medina's trial testimony was false. The petitioner showed during his cross-examination of Mr. Medina that Mr. Medina testified to things on direct examination that were inconsistent with or omitted from statements he previously made to police officers. However, this is not proof that Mr. Medina presented false testimony at trial. Instead, it may mean that Mr. Medina lied or was less than completely truthful in his previous statements. In addition, showing that Mr. Medina had a motive to lie and a checkered past is pertinent to his credibility but it is not conclusive evidence that he lied in his testimony at trial. Finally, showing that Mr.

21

Medina's testimony contradicted other evidence at trial does not necessarily mean that he lied but could indicate that his memory was faulty as to specific events that occurred two years earlier. These are areas which are appropriate for vigorous cross-examination. Thus, we find that the petitioner has failed satisfy the first prong in *Franklin* by showing that Mr. Medina presented false testimony at trial.

Indeed, we note that the petitioner's counsel effectively impeached Mr. Medina's testimony including his testimony that the petitioner confessed to him by demonstrating Mr. Medina's untruthful character, his prior convictions, and his numerous inconsistent statements. Upon hearing Mr. Medina's testimony and the cross-examination, it was for the jury to determine Mr. Medina's credibility, and this Court will not second guess the jury on this issue.

## F. *Final Two Assignments of Error*

In addition to the assignments of error above, the petitioner has set forth two assignments of error that he represents were drafted by him without the aid of counsel. In the first assignment of error, the petitioner asserts that the prosecutor made improper remarks and engaged in prosecutorial misconduct.

As a preliminary matter, we note that we have already addressed some of the issues raised by the petitioner such as the petitioner's allegations that the prosecutor improperly attacked his constitutional right to remain silent, knowingly elicited and used

the false testimony of Joseph Medina, and improperly cross-examined the petitioner regarding his novel. For the reasons stated above, this Court has found no merit to these allegations.

The petitioner also accuses the prosecutor of intentional misconduct such as deliberately misstating scenes from the petitioner's novel for the purpose of prejudicing the petitioner and intentionally misquoting witness testimony. After reviewing the portions of the record cited by the petitioner, we find no evidence of intentional prosecutorial misconduct. Moreover, we have no reason to believe that any misstatements by the prosecutor regarding the evidence were anything more than accidental. Such misstatements of evidence simply could have been dealt with by means of a contemporaneous objection and instruction by the circuit court. Also, we note that the court properly instructed the jury that anything said by the lawyers during the trial is not to be considered evidence. As a result, we find that any accidental misstatements of the evidence by the prosecutor did not prejudice the petitioner.

In addition, the petitioner avers that the prosecutor inundated the trial and her closing argument with improper remarks. This Court has held:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4)

23

> whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. pt. 6, *State v,* Sugg, 193 W. Va. 388, 456 S.E.2d 469 (1995). Further, "[a] judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syl. pt. 5, *State v. Sugg*. The petitioner has presented us with a long laundry list of allegedly improper comments made by the prosecutor. After considering each comment, this Court finds no reversible error. Any improper comments were isolated, were not deliberately placed before the jury to divert its attention to extraneous matters, and did not have a tendency to mislead the jury or prejudice the petitioner. Therefore, we find that any improper comments made by the prosecutor do not constitute reversible error.

In the petitioner's last assignment of error, the petitioner asserts that his convictions should be reversed because the trial court made improper remarks and engaged in judicial misconduct. Most of the petitioner's argument is a rehashing of the assignments of error presented by the petitioner's counsel and addressed by this Court above. The remainder of the petitioner's argument consists of frivolous assertions of bias which this Court deems wholly unnecessary to address.

24

## IV. CONCLUSION

For the reasons set forth above, we affirm the October 9, 2012, order of the Circuit Court of Berkeley County that denied the petitioner's motion for judgment of acquittal after a jury found the petitioner guilty of two counts of first-degree murder, both without a recommendation of mercy, and one count of arson.

Affirmed.